# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| United States of America *ex rel*. CHARLES SOODAVAR, | |
| Plaintiff, | |
| v. | Civil Action No. 1:14-cv-1217 (TSE/TCB) |
| UNISYS CORPORATION, | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT UNISYS CORPORATION'S <u>MOTION TO DISMISS</u>

Adam P. Feinberg (VSB No. 37331)
Charles F.B. McAleer, Jr. (VSB No. 24430)
James A. Bensfield*
Jonathan D. Kossak*
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 626-5800 (telephone)
(202) 626-5801 (facsimile)
E-mail: afeinberg@milchev.com
         cmcaleer@milchev.com
(*) *pro hac vice* application forthcoming

Dated:  January 25, 2016            *Counsel for Defendant Unisys Corporation*

Defendant Unisys Corporation ("Unisys") respectfully submits this memorandum of points and authorities in support of its Motion to Dismiss, and states as follows:

## INTRODUCTION

Relator Charles Soodavar ("Soodavar") filed this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq*., alleging that Unisys submitted false claims to the government under a contract known as "Task Order 122" or "TO 122."  This is not the first FCA suit against Unisys involving TO 122.  When Soodavar filed his case under seal in 2014, counsel for both parties in this case had just finished discovery in another FCA suit in which Soodavar was a witness and in which his lawyer represented the relator, Michael Saunders:  *United States ex rel. Saunders v. Unisys Corporation*, No. 1:12-cv-379-GBL-TCB (E.D. Va. Compl. filed Apr. 6, 2012) [hereinafter, *Saunders*].  In January 2015, Judge Lee dismissed the *Saunders* case with prejudice pursuant to a Stipulation of Dismissal submitted by the parties and the United States.

Some of Soodavar's allegations are nothing more than recycled versions of those in *Saunders* and must be dismissed both under the FCA's first-to-file jurisdictional bar, 31 U.S.C. § 3730(b)(5), and as precluded by res judicata.  Count V here alleges an employee time-charging scheme that Soodavar expressly acknowledges is "the same" as "the red/blue and 50/50 billing schemes" alleged in *Saunders*.  Compl. ¶ 115 (ECF No. 1) [hereinafter, "Complaint" or "Compl."].  Although Count V here aims to apply the alleged scheme to a different set of Unisys employees, the Fourth Circuit has held that such a difference will not avoid application of the first-to-file bar.  Count V also is barred by res judicata because it involves the same alleged scheme and the same invoices at issue in *Saunders*.

The same goes for Soodavar's Count I, which alleges that Unisys's invoices were false because they "were for amounts based on, and supported by, time records that did not reflect

actual [employee] time accrued." *Id.* ¶ 82.  Saunders not only made the same allegation but did so using the same exact language.  Further, the same time records for the same employees in the same invoices are at issue in both *Saunders* and Count I here.  The only difference is the specific reason why the time records are alleged to be false.  That is not enough of a difference to escape either the first-to-file bar or the effects of res judicata.

Separately, *all* of Soodavar's counts must be dismissed because they are pled inadequately.  The FCA is a fraud statute and thus Soodavar's allegations must be pled with particularity as required by Rule 9(b).  He fails to do so at every turn.  He provides no examples or details of an actual false invoice submitted to the government, which the Fourth Circuit has held is a basic pleading requirement in FCA cases.  Nor has he pled other required details about the various alleged frauds, such as which employees were involved or when each allegedly fraudulent act occurred.  In one count regarding assertions that Unisys hired unqualified employees, Soodavar essentially admits that he is unable to plead fraud with particularity when he states that a future "investigation . . . will show" that many – but not all – of a long list of employees were unqualified.  *Id.* ¶ 57.  Many of Soodavar's allegations are so deficient, they do not even meet the *Iqbal* and *Twombly* test for plausibility, let alone comply with Rule 9(b).

## **FACTUAL BACKGROUND**

### **A.    Task Order 122**

This case involves TO 122, under which Unisys provided services in connection with the U.S. Army's radio-frequency identification ("RFID") equipment-tracking program beginning in May 2007 and ending in 2011.  Compl. ¶¶ 9, 10 & at p. 3 (unnumbered paragraph).  Prior to May 2007, Unisys supported the RFID program under a predecessor delivery order that is not at issue in this case.  *Saunders* Second Amended Complaint, ECF No. 103, ¶¶ 13, 22 (attached as Ex. A)

[hereinafter *Saunders* SAC].  The work under TO 122 was broken down into separate Contract Line Item Numbers or "CLINs."  Compl. ¶ 12; *Saunders* SAC ¶ 18.  CLINs 1 and 2 covered the installation (or "fielding") and maintenance (or "sustainment") of RFID sites.  *Saunders* SAC ¶¶ 15, 18.  CLIN 4 covered software development and support.  Compl. ¶ 70.  The work under these CLINs was performed by Unisys employees called "Field Service Engineers" or "FSEs." *Id*. ¶ 8; *Saunders* SAC ¶ 4.  They worked around the globe at various U.S. military commands such as U.S. Central Command ("CENTCOM"), which includes Afghanistan and other theaters of war in Southwest Asia.  Compl. ¶ 12 & at p. 3 (unnumbered paragraph); *Saunders* ECF No. 147, ¶ 4 (attached as Ex. B).

CLINs 1, 2, and 4 were broken down into "sub-CLINs" designated "AA" and "AB," with these sub-CLINs being billed on a different basis.  Compl. ¶ 70; Ex. B ¶¶ 10-12.  The "AA" work involved installing new RFID units or developing new RFID software, while the "AB" work involved maintaining already existing RFID units or software.  *Id*.  The "AA" sub-CLINs were billed on a firm fixed price award fee ("FFP") basis, under which a set fee was billed regardless of the hours worked or amount of work accomplished; the "AB" sub-CLINs were billed on a time and materials ("T&M") basis, *i.e.*, billings were based on the number of hours worked as reflected in time records included in the invoice.  *Id*.; *see also* Ex. B ¶ 25.

## B.  The *Saunders* Lawsuit

In his SAC, Saunders made several allegations regarding TO 122, two of which are relevant here.  The first involved the so-called "red/blue" and "50/50" billing schemes.  Saunders alleged that from 2008 to 2010, Unisys overcharged the Army by instructing employees "to apply [an] artificially designed formula to charge the T&M [portions of TO 122] for their activity without regard to what the FSEs were actually doing."  *Saunders* SAC ¶ 4.  These

2062827.1

allegations centered on CLINs 1 and 2, under which Unisys installed (or "fielded") new RFID systems and maintained (or "sustained") existing systems. *Id*. ¶ 18.  As noted above, fielding work was done under the AA sub-CLINs that were billed on a FFP basis, while sustainment work was done under the AB sub-CLINs that were billed on a T&M basis. *Id*. ¶¶ 16, 18.  Saunders alleged that during the initial period of performance after TO 122's May 7, 2007 start date, Unisys employees submitted time entries for "[s]ustainment" work (billed on a T&M basis) "at a much higher rate than had been anticipated by Unisys's Bid Model, and conversely, '[f]ielding' [billed on a FFP basis] at a much lower rate."[1] *Id*. ¶ 24.

Saunders alleged that in November 2007 an Army official noticed "Unisys' excessive 'sustainment' T&M billing" and then "'redefine[d] the intent' of TO 122 CLIN 1 and 2" by either agreeing to or ordering a "'clarification'" under which most of the FSEs' time would be billed to the FFP fielding sub-CLINs (1AA and 2AA). *Id*. ¶¶ 27-29; *Saunders* ECF No. 1, ¶¶ 26-27 (attached as Ex. C).  Saunders alleged that Unisys management later realized that the "'clarification'" "was proving to be unprofitable because it severely limited Unisys' T&M billing opportunity." *Saunders* SAC ¶ 37.  According to Saunders, Unisys management then directed Unisys employees Douglas Herr and James Hayes to improve TO 122 profitability by increasing T&M billing. *Id.* ¶ 42; Ex. C ¶ 32.  Saunders claimed that Herr and Hayes then "c[a]me up with the red/blue team plan," which would move "FSE billing back to T&M," "making the business profitable again." *Saunders* SAC ¶ 44.  Under this alleged plan, the red team would bill the majority of its time as FFP and the blue team would bill the majority of its time as T&M.  Ex. C ¶ 32.  The alleged purpose of the red/blue team plan was "that FSEs would be charging very close to the Bid Model." *Saunders* SAC ¶ 43.

---

[1] "Bid Model" refers to the labor costs Unisys had proposed for the work. *Id.* ¶ 20.

Although his allegation shifted, Saunders eventually alleged the start date of the "Red/Blue Plan" to be April 11, 2008.  *Saunders* ECF No. 172 at 6 (¶ 31) (attached as Ex. D). He claimed that, for the next two and a half years, Unisys FSEs "submitted time cards adhering to the predetermined percentages in the red/blue team plan" and later "adhering [to] predetermined percentages of the '50/50' team plan."[2]  *Saunders* SAC ¶ 55.  He alleged that Unisys violated the FCA because it submitted invoices "for amounts based on, and supported by, time records that did not reflect actual FSE time accrued."  *Id*. ¶ 97.  The red/blue and 50/50 plans ended on October 7, 2010, when Unisys took corrective action by "instruct[ing] its FSEs to stop billing their work on TO 122 according to the 50/50 plan and to bill only actual time accrued."  *Id*. ¶ 70.

Aside from the "red/blue" and "50/50" allegations that had always been in Saunders's pleadings, Saunders's SAC added a new allegation that Unisys, in its proposal to the government, had not been "truthful" about "how many RFID sites it had installed and was" maintaining.  *Id*. ¶ 54.  Saunders asserted that this overstatement led to FSEs not having enough work to do and that – because they had to bill 8 hours each working day – they improperly billed time as T&M when they were "on call" or otherwise had nothing to do.  For example, Saunders claimed that FSEs were improperly charging their time in 2007 even before the red/blue plan started because "Unisys permitted FSEs who were not doing anything to charge T&M." *Saunders*, Pl.'s Responses to Request for Admissions at 13 (Request 107) (Sept. 12, 2014) (attached as Ex. E).  He also alleged that even "[a]fter the corrective action on October 8, 2010, Unisys charged too much T&M because TO 122 priced many more RFID sites than what Unisys was actually sustaining, and because Unisys FSEs charged T&M when they were not charging

---

[2] According to Saunders, "[t]he 50/50 team plan employed the same methodology as the red/blue team plan except that FSEs were not assigned to red or blue teams."  *Saunders* SAC ¶ 56.

FFP to meet their weekly hourly charging requirements." *Saunders*, Pl.'s Am. Responses to Second Interrogatories at 8 (Interrogatory 28) (Sept. 16, 2014) (attached as Ex. F).

Saunders claimed to have learned these alleged facts from, among other sources, Soodavar (*see Saunders* ECF No. 93 at 4; attached as Ex. G) and the government's investigation of Saunders's original complaint.  Herr was interviewed during the course of that investigation and explained that much of the T&M maintenance time was spent "sitting around a table, waiting" for something to happen that would require attention.  Douglas Herr Dep. Tr. at 43:3-6 (May 3, 2013) (attached as Ex. H).  As Herr put it, "while you were sitting around waiting to see if you had to fix anything, you would bill that time" as T&M.  *Id*. at 50:2-5.  Later in Herr's interview, an AUSA asks "the hours were, in fact, not working.  They were sort of being available.  Would [Unisys FSEs] still bill"?  *Id*. at 58:2-4.  Herr answered "[a]bsolutely"; "[t]he government wants us ready – we're like on call"; "[l]ike we did in the Army.  We're sitting around waiting and getting paid for it" for "[e]ight hours a day, seven days a week" in certain overseas areas.[3]  *Id*. at 58:5-18.

Shortly before trial, Saunders, Unisys, and the government (which, as here, had declined to intervene in the action) participated in mediation sessions with Magistrate Judge Buchanan and entered into a settlement agreement regarding the substantive FCA claims.  *See* Settlement Agreement (attached as Ex. I).  Under the agreement, the United States released Unisys from FCA and other liability for the "Covered Conduct," defined as the "conduct alleged in [Saunders'] Second Amended Complaint."  *Id*. at 2, 4.  On December 26, 2014, Saunders, Unisys, and the United States filed a Stipulation of Dismissal with Prejudice.  *Saunders*, ECF No. 187 (attached as Ex. J).  The Court endorsed that stipulation on January 5, 2015.  *Saunders*,

---

[3] Herr explained earlier in the interview that FSEs had to record a total of eight hours for each working day to the FFP or T&M sub-CLINs.  *Id*. at 47:16-17.

ECF No. 188 (attached as Ex. K).

      **C.**      **The Allegations in this Case**

      Soodavar's complaint contains five scattershot counts alleging FCA violations in relation to TO 122. Count V is the easiest to describe because, according to Soodavar, it alleges "the same thing" that Unisys allegedly did "under CLIN 1 and 2 according to the red/blue and 50/50 billing schemes" that were the subject of *Saunders*. Compl. ¶ 115. That is, Count V alleges that Unisys employees working on TO 122 used "predetermined percentages" to split their time between FFP and T&M, "regardless of the work performed." *Id*. ¶ 113; *see also id*. ¶¶ 1, 73. Soodavar asserts that this conduct occurred over the same time period as Saunders's red/blue and 50/50 allegations: April 2008 to October 7, 2010. *Id*. ¶¶ 73, 113. The only difference between Count V here and the red/blue and 50/50 allegations in *Saunders* is that Count V alleges that Unisys employees working under CLIN 4 were engaged in the conduct, while Saunders made the allegation about employees working under CLINs 1 and 2. *Id*. ¶¶ 70, 72-74, 77.

      Soodavar's Count I also presents a recycled version of the allegations in *Saunders*. As in *Saunders*, Count I alleges that FSEs recorded time they did not actually work. Specifically, in Count I, Soodavar alleges that all of the FSEs working in CENTCOM billed 56 hours a week (*i.e.*, 8 hours a day, 7 days a week) but actually worked only 40 hours (*i.e.*, 8 hours a day, 5 days a week). *Id*. ¶¶ 12, 14, 19-20. Soodavar alleges that this led to Unisys submitting invoices "for amounts based on, and supported by, time records that did not reflect the actual FSE time accrued." *Id*. ¶ 82. Even though Soodavar claims to have witnessed the alleged conduct only on a single occasion in 2010 in Kuwait, *id*. ¶¶ 13-14, he extrapolates his allegations to all FSEs throughout CENTCOM for the entire life of TO 122. *Id*. ¶¶ 12, 20, 81.

      In Count II, Soodavar alleges that Unisys paid some FSEs amounts for danger and hardship pay, living quarters allowance, and relocation payments in excess of what was

permitted, and then charged those amounts to the government over the entire life of TO 122.  *Id*.
¶¶ 21-45, 89-93.  In Count III, Soodavar claims that Unisys – again, over the entire life of TO
122 – hired employees to work on TO 122 who were not qualified.  *Id*. ¶¶ 46-57, 99-102.
Soodavar does not explain why they were purportedly unqualified or what qualifications TO 122
requires.  In Count IV, Soodavar attempts to make out an allegation pursuant to 31 U.S.C.
§ 3729(a)(1)(D) under which Unisys allegedly failed to return property that belonged to the
government.  *Id*. ¶¶ 58-69, 106-08.

## ARGUMENT

    Unisys files this motion under both Rule 12(b)(1) and 12(b)(6).

    "A test of subject matter jurisdiction under Rule 12(b)(1) may proceed 'in one of two
ways':  either a facial challenge, asserting that the allegations pleaded in the complaint are
insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the
jurisdictional allegations of the complaint [are] not true' or that other facts, outside the four
corners of the complaint preclude the exercise of subject matter jurisdiction."  *United States ex
rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840 (D. Md. 2013) (quoting *Kerns v. United
States*, 585 F.3d 187, 192 (4th Cir. 2009)).  First-to-file challenges are factual challenges under
Rule 12(b)(1), not facial challenges.  *E.g.*, *Palmieri*, 928 F. Supp. 2d at 848.

    "In a factual challenge to subject matter jurisdiction, 'the plaintiff bears the burden of
proving' that subject matter jurisdiction is satisfied 'by a preponderance of the evidence.'"  *Id*.
(quoting *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th. Cir. 2009)).  In such a
case, the court "may consider evidence outside the pleadings without converting the proceeding
to one for summary judgment."  *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

    To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although a court must accept as true all well-pleaded factual allegations, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Although a Rule 12(b)(6) motion to dismiss is typically circumscribed to the allegations in the pleadings, a "court may look to documents attached to the Complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment." *Old Dominion Univ. Research Found. v. Aqua Terra Int'l, LLC*, No. 2:14cv305, 2014 WL 5790944, at *2 (E.D. Va. Nov. 5, 2014) (citation omitted). Courts may also consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." *Id*. (internal quotation marks omitted).

## I.     COUNTS I AND V MUST BE DISMISSED UNDER THE FIRST-TO-FILE BAR

31 U.S.C. § 3730(b)(5) provides that, once a plaintiff has filed a *qui tam* action, "no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." This provision, known as the "first-to-file" bar, is jurisdictional. "If an action is later filed that is based on the facts underlying the pending case, the court must dismiss the later case for lack of jurisdiction." *United States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013), *aff'd in part, rev'd in part and remanded sub nom. Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970 (2015).

To determine whether the first-to-file bar applies in a given case, the court must follow a

2062827.1

two-step analysis.  First, the court must determine whether the earlier-filed action was "pending" at the time the later action was commenced.  *United States ex rel. Beauchamp v. Academi Training Ctr., Inc.*, 933 F. Supp. 2d 825, 835 (E.D. Va. 2013).  The ultimate resolution of the first-filed case is irrelevant; as long as the first case was ongoing at the time the second action was filed, the earlier case was "pending" for purposes of § 3730(b)(5).  *Id.* (citing *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1188 (9th Cir. 2001)); *see also Carter*, 710 F.3d at 183 ("we look at the facts as they existed when the claim was brought to determine whether an action is barred by the first-to-file bar").  So long as the first case was pending at the time the second was filed, a later dismissal of the first case is irrelevant for first-to-file purposes.  *U.S. ex rel. Carter v. Halliburton Co.*, No. 1:11CV602 JCC/JFA, 2015 WL 7012542, at *6 (E.D. Va. Nov. 12, 2015).  Here, there is no question that *Saunders* was pending when Soodavar filed this case on September 16, 2014 (*see* ECF No. 1).  The *Saunders* complaint was filed April 6, 2012, and remained pending until at least December 2014.  *See* Exs. C, J.

The second step of the analysis is "determin[ing] whether the claims in the later-filed action are based on facts underlying the first-filed action."  *Beauchamp*, 933 F. Supp. 2d at 835.  The "based on" language of § 3730(b)(5) has broad meaning, and the facts of the two suits need not be identical.  The uniform rule is that "a later suit is barred if it is based upon the same material elements of fraud as the earlier suit, even though the subsequent suit may incorporate somewhat different details."  *Carter*, 710 F.3d at 181-82 (internal quotation marks omitted).  "[C]ourts have almost uniformly rejected an 'identical facts' test on the ground that the provision refers to a 'related' action rather than an 'identical' action."  *Id.*; *see also Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 635-36 (E.D. Va. 2006) ("the actions being assessed need not be identical if there is substantial overlap with respect to the issues and parties");

2062827.1

*Beauchamp*, 933 F. Supp. 2d at 836 ("the first-to-file bar does not require identical facts, merely shared material elements of fraud").  Both Counts I and V here are barred by the first-to-file rule.

    *Count V Is Barred*.  We address Count V first, because it presents a situation essentially identical to the one addressed by the Fourth Circuit in *Carter*:  alleging the same fraudulent scheme pled in an earlier suit but applying it to a different set of the defendant's employees.  The Fourth Circuit held expressly that, in such situations, "differences in specifics—such as geographic location or added facts—will not save a subsequent case" from the first-to-file bar. *Carter,* 710 F.3d at 181.  In *Carter*, the plaintiff alleged via a complaint filed in 2011 that KBR had fraudulently billed the United States for services provided to the military in Iraq.  *Id*. at 174. Carter, who worked for KBR as a reverse osmosis water purification unit (ROWPU) operator in Iraq in 2005, alleged among other things that all KBR trade employees were instructed to submit time sheets for 12-hour workdays and 84-hour workweeks regardless of how much time they worked.  *Id*. at 175.  However, prior to Carter's complaint, two other actions had been filed by relators who were truck drivers working for KBR in Iraq from 2003 to 2006; those relators had alleged that KBR instructed its truck driver employees to submit timesheets for 12-hour workdays and 84-hour workweeks regardless of the amount of time they worked.  *Id*. at 176. The district court dismissed Carter's complaint under the first-to-file bar.  *Id*.

    On appeal, the Fourth Circuit agreed that Carter's action was barred by § 3730(b)(5). The court held that in a case involving two complaints alleging the same general scheme perpetrated by the same company, the later-filed action could not avoid the first-to-file bar simply by alleging fraud "via different types of employees and in different divisions" of the defendant.  *Id*. at 182.  Such distinctions, the court said, are "insufficient to demonstrate" that the later suit is not based on the facts underlying the earlier one.  *Id.*

Under *Carter*, Count V of Soodavar's complaint is plainly barred as it is a carbon copy of the "red/blue" and "50/50" allegations in *Saunders*. Both allege that Unisys employees working on TO 122 used "predetermined percentages" to split their time between FFP and T&M, "regardless of the work performed." *Compare* Compl. ¶ 113 *with Saunders* SAC ¶ 96; *compare also* Compl. ¶¶ 1, 73 *with Saunders* SAC ¶¶ 4, 55-58. Soodavar admits that in Count V he is alleging the same scheme as in *Saunders* when he states that "Unisys did the *same thing* under CLIN 1 and 2 according to the red/blue and 50/50 billing schemes." Compl. ¶ 115 (emphasis added). The only difference is that *Saunders* dealt with Unisys employees working under CLINs 1 and 2, while Soodavar's Count V deals with CLIN 4 employees. Under *Carter*, the fact that Soodavar's allegations involve "different types of employees" cannot avoid the application of the first-to-file bar where, as here, the relators allege the same fraudulent scheme. 710 F.3d at 182.

*Count I Is Barred*. Count I is also barred in light of *Carter* and similar cases, which hold that a later-filed complaint is not saved from the first-to-file bar merely because it alleges that the fraud was perpetrated by different means. An earlier complaint filed by Carter in 2009 (identical to his 2011 complaint at issue in the Fourth Circuit appeal, 710 F.3d at 176) was dismissed by the district court on precisely these grounds. When the 2009 complaint was filed, another case – *United States ex. rel. Thorpe v. Halliburton Co*., No. 05-cv-08924 (C.D. Cal. filed Dec. 23, 2005) – was pending. The allegations in *Thorpe* mirrored those later alleged by the truck driver relators, in that they all claimed that KBR had a practice of billing 12-hour workdays without regard for the time actually worked. Carter tried to distinguish his complaint on the grounds that, in addition to the 12-hour workdays allegation, he also alleged that KBR was billing for a type of service (water purification) that it was not performing at all. *Id*. at 175. The district court rejected that distinction, reasoning that to prove either facet of the scheme, Carter "must show

2062827.1

that KBR employees were reporting hours that they did not work," and "the fact that KBR was not performing water services is merely evidence that the time sheets were false." *Id.*

Carter appealed the dismissal of his 2009 complaint but dismissed that appeal. He later appealed the dismissal of his identical 2011 complaint. The Fourth Circuit found that complaint barred by the two FCA cases previously filed by the truck drivers because they also made the 12-hour workdays allegation. The court did so despite knowing that Carter's 2011 complaint was identical to the 2009 complaint and thus also contained the additional allegation that KBR was billing for water purification services it was not performing at all. *Id.* at 182. Despite Carter's additional allegation, the Fourth Circuit held that the "fraud alleged – submission of false time sheets in support of claims for false payments – is the same in all of the complaints." *Id.*

Similarly, in *Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276 (10th Cir. 2004), the court held that a later-filed complaint could not avoid the first-to-file bar merely by alleging different means by which the same company had underpaid the government via the submission of false reports. In *Grynberg*, the earlier of two complaints alleged that the defendant gas producers were mismeasuring gas they extracted on federal lands so as to underpay royalties to the United States. *Id.* at 1277. The complaint described at least eight different ways in which this was accomplished, including installing drip valves on pipes and letting the ink run dry on recording pens. *Id.* A later action also alleged that the defendant fraudulently measured gas and underpaid royalties, but it alleged different means by which the company did so. *Id.* at 1277-78. Among other things the defendant allegedly "used natural gas to fuel its own downstream activities without paying for it, created unnecessary obstructions to disrupt gas flow, paid for gas only up to an arbitrary BTU [British Thermal Unit] value, regardless of its true BTU value, and misapplied a contractual provision allowing for a two percent error rate in volume measurements

2062827.1

by automatically subtracting two percent from its volume figures." *Id*. at 1278.  The court concluded that the second lawsuit was barred, because the second plaintiff "ha[d] not managed to avoid § 3730(b)(5)'s first-to-file bar simply by alleging additional facts relating to *how* [defendant] mismeasured the natural gas, even though some of those specific allegations were not mentioned in the [earlier-filed] complaint." *Id*. at 1280.

Cases like *Carter* and *Grynberg* make clear that Count I of Soodavar's complaint cannot survive the first-to-file bar.  In fact, two different sets of allegations from *Saunders* each independently bar Count I here.  First, Saunders's "red/blue" and "50/50" allegations asserted that Unisys FSEs working under CLINs 1 and 2 improperly billed time based on a formula and thus Unisys submitted invoices "for amounts based on, and supported by, time records that did not reflect actual FSE time accrued." *Saunders* SAC ¶ 97.  Although he alleges a different means, Soodavar in Count I alleges the same material elements, even using the same exact language just quoted.  *See* Compl. ¶ 82.

Second, Saunders alleged that "Unisys permitted FSEs who were not doing anything to charge T&M." Ex. E at 13 (Request 107).  In Count I, Soodavar alleges that FSEs billed time for weekend days when they were not doing anything.  Compl. ¶ 14.  As in *Carter*, both the earlier filed and current cases allege that Unisys billed for work that was not done.  Because both Count I here and the *Saunders* SAC allege that the same FSEs working under CLIN 2 of TO 122 were recording time for work not performed, Count I is barred by 31 U.S.C. § 3730(b)(5) and must be dismissed for lack of jurisdiction.

## II.    COUNTS I AND V ARE BARRED BY RES JUDICATA

The *Saunders* case requires the dismissal of Counts I and V here for an entirely different reason:  those counts are subject to res judicata, which bars a subsequent suit when there is: "(1) a final judgment on the merits in an earlier suit, (2) an identity of the cause of action in both the

earlier and the later suit, and (3) an identity of parties or their privies in the two suits." *Nash Cty. Bd. of Ed. v. Biltmore Co.*, 640 F.2d 484, 486 (4th Cir. 1981).

As to the first element, the *Saunders* dismissal qualifies because a stipulated dismissal with prejudice is a final judgment on the merits. *Harrison v. Edison Bros. Apparel Stores*, 924 F.2d 530, 534 (4th Cir. 1991).  The third element is also met because, in a *qui tam* action, the Government is the real party in interest. *United States v. Health Possibilities, P.S.C.*, 207 F.3d 335, 341 (6th Cir. 2000).  Thus, if "res judicata is deemed applicable against the Government, then a relator's claims are foreclosed as well." *United States ex rel. Sarafoglou v. Weill Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d 613, 619 (S.D.N.Y. 2006); *see also United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 912 (4th Cir. 2013); *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (9th Cir. 1998).

That leaves only the second element of the test.  Under traditional res judicata analysis, claims arise under the same cause of action when they flow from the same transaction or series of connected transactions, or common nucleus of operative facts.  *Harnett v. Billman*, 800 F.2d 1308, 1314 (4th Cir. 1986).  Claims may share the same cause of action and therefore arise out of the same transaction or series of transactions even if they involve different harms or different theories or measures of relief.  *Id.*  A later claim may be barred by res judicata if it shares a common scope and subject matter as the prior claim, even if the factual allegations vary somewhat.  *See Serna v. Holder*, 559 F. App'x 234, 238 (4th Cir. 2014) (per curiam); *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002) (new law suit alleging different violations of the same contract involved in a prior suit is barred by res judicata).  Among the factors to be considered in deciding "whether the facts of the current and prior claims are so woven together that they constitute a single claim are their relatedness in time, space, origin, or

motivation, and whether, taken together, they form a convenient unit for trial purposes." *Pittston Co. v. United States*, 199 F.3d 694, 7041 (4th Cir. 1999) (internal quotation marks omitted).

The Fourth Circuit recognizes a modified version of res judicata where a dismissal with prejudice results from a settlement agreement. *May*, 737 F.3d at 913. In such cases, the principles of res judicata apply but only to the matters specified in the settlement agreement (instead of to the matters alleged in the complaint). *Id.* When the effect of res judicata is modified in this manner, courts look to the intent of the parties to determine the scope of preclusion. *See Keith v. Aldridge*, 900 F.2d 736, 741 (4th Cir. 1990). However, even if this modified version of res judicata were to apply here, it is a distinction without a difference because the "Covered Conduct" in the *Saunders* settlement agreement is defined as the "conduct alleged in the Second Amended Complaint."[4] Ex. I at 2.

Because the conduct alleged in *Saunders* and in Counts I and V here constitute the same cause of action, those counts are barred by res judicata. What is that conduct? Unisys submitted claims under TO 122 that are allegedly false because they contain inaccurate time records. Under the FCA, liability attaches not to "the underlying fraudulent activity," but rather to "the 'claim for payment.'" *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) (citation omitted); *see also Barajas*, 147 F.3d at 910. A defendant's submission of false claims is the "transactional nucleus" for purposes of res judicata and a second suit will be barred by a previous judgment if the two "relate to the same invoices,

---

[4] Many courts – including some within the Fourth Circuit – find that unless a settlement agreement is actually incorporated into the court's dismissal order, traditional res judicata principles apply without reference to the terms of the settlement. *See, e.g.*, *Oreck Direct, LLC v. Dyson, Inc.*, 560 F.3d 398 (5th Cir. 2009) (claims barred by prior dismissal with prejudice notwithstanding terms of settlement); *Simontacchi v. Invensys, Inc.*, No. CIV. 3:05CV283, 2008 WL 141905 (W.D.N.C. Jan. 11, 2008) (same). The dismissal in *Saunders* did not incorporate the settlement agreement or its terms. *See* Exs. J, K.

the same payments of money the government made." *Barajas*, 147 F.3d at 910-11; *see also Sarafoglou*, 451 F. Supp. 2d at 621; *United States ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.*, No. 04 CIV. 3088(WHP), 2010 WL 476707, at *5 (S.D.N.Y. Jan. 21, 2010). It does not matter "whether [claims] were false for two reasons or one." *Barajas*, 147 F.3d at 910. Because both Counts I and V allege that Unisys submitted the same false claims under the same contract at issue in the *Saunders* SAC, they are barred by res judicata.

Even if the Court examined the allegations in Counts I and V and in *Saunders* in more detail, it is still clear they involve the same conduct. Both Counts I and V here and the *Saunders* SAC allege that Unisys's employees' time records contained in invoices submitted under TO 122 are false. The allegations in *Saunders* and Count I here are even more similar because both involve the *same employees*' time records – *i.e.*, the Unisys employees working under CLIN 2 of TO 122.[5] And, the alleged reason for their falsity is the same: they included time entries for T&M work that was not actually done, with Soodavar and Saunders using the same language to describe what made the records false. *Compare* Compl. ¶ 82 *with Saunders* SAC ¶ 97. Regarding Count V, although the specific employee time records are different than in *Saunders*, both involve the identical alleged "red/blue" and "50/50" schemes, cover the same time period, and involve the same allegedly false invoices.[6]

The minor differences between *Saunders* and Counts I and V here cannot avoid the application of res judicata. In FCA cases where parties release claims for defined "covered conduct," a subsequent cause of action may still be barred even if it alleges different facts or greater misconduct. *See Sarafoglou*, 451 F. Supp. 2d at 620-21; *Resnick*, 2010 WL 476707, at

[5] The *Saunders* SAC also involved employees working under CLIN 1, but the fact that the earlier case is broader than the current one is irrelevant for res judicata purposes.

[6] Unisys submitted consolidated invoices on a monthly basis, with each invoice containing the billing for all CLINs under TO 122.

2062827.1

*5. *Sarafoglou* and *Resnick* are particularly instructive because of their striking similarities to this case.[7]

In *Resnick,* the relator brought a *qui tam* action alleging that the defendant made a number of misrepresentations to receive federal research grants.  *Resnick*, 2010 WL 476707, at *1.  The relator's complaint specifically alleged that the defendant:

> failed to disclose other grants and support that she received, thereby allowing her to 'over-commit' her professional time for certain grants (the "Overcommitment Allegations") . . . ; misrepresented which researchers were working on certain grants (the "Staffing Allegations") . . . ; misapplied and fraudulently accounted for funds for certain grants (the "Misapplication Allegations") . . . ; falsified data from her research for certain grants (the "False Data Allegations") . . . ; submitted the same projects multiple times . . . (the "Double Dipping Allegations") . . .; and lied to obtain an extension to submit a grant application (the "Extension Allegations").

*Id*. at *1.  The government elected to intervene in the action and settled claims for 11 of the grants at issue (the "Settled Grants").  *Id.* at *2.  However, the settlement agreement expressly reserved the right to pursue claims for any conduct other than the Covered Conduct, which was defined as the "Overcommitment Allegations" only.  *Id.*

After the government settled, the relator pursued the other claims against the defendant, *i.e.*, the Staffing Allegations, Misapplication Allegations, False Data Allegations, Double Dipping Allegations, and Extension Allegations as applied to the Settled Grants among others. *Id*. at *1-5.  The relator argued that because her claims focused on different fraudulent statements, her claims were distinct from the Covered Conduct, which included the Over-Commitment Allegations only.  *Id.* at *5; *see also id*. at *1.  The court rejected that distinction as

---

[7] In addition, Second Circuit precedent is significant because it follows a modified res judicata approach that is the same as the Fourth Circuit's when a dismissal with prejudice is based on a settlement agreement.  In both, "the preclusive effect of a settlement is measured by the intent of the parties to the settlement."  *Greenberg v. Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir.1992) (citations omitted); *U.S. ex rel. Barmak v. Sutter Corp.*, No. 95 CIV.7637 KTD RLE, 2002 WL 987109, at *3 (S.D.N.Y. May 14, 2002).

a basis for avoiding res judicata. *Id.* at *5. Notwithstanding the different means, the court held that the Covered Conduct and the remaining allegations stemmed from the same overarching misconduct: "the submission of false statements by [the defendant] in the applications and reports for the Settled Grants." *Id.* Accordingly, the relator's remaining claims were barred. *Id.*

*Sarafoglou*, which also involved allegedly false statements in federal grant applications and reports, reached a similar conclusion. *Sarafoglou*, 451 F. Supp. 2d at 616. There, the government partially intervened in the action and reached a settlement with the defendant for the "Covered Conduct," which was defined as the "conduct occurring during the [specified time period] when [the defendant] applied to the NIH for Grants 5M0 and allegedly submitted false statements and claims in connection with that grant." *Id.* at 619. As in *Saunders*, the agreement referred to the complaint for a more descriptive account of the Covered Conduct. *Id.* The complaint in *Sarafoglou* focused on the allegation that defendant violated something known as "the 33% guideline," *i.e.*, "the rule that no single group of researchers or category of research can expend more than 33% of the federal research funds provided to them in a grant." *Id.* at 621 n.2.

After the government settled, the relator pursued a *qui tam* action alleging that the defendant made *different* false statements concerning grant 5M0 having nothing to do with the 33% guideline allegations. *Id.* at 620-21. Specifically, the relator alleged that "research funded by the pharmaceutical companies was charged to the grant, that there was misuse of the core laboratories material resources funded by the grant, and that there was a broad scheme to falsify outpatient information." *Id.* at 621 (internal quotation marks omitted). The relator argued that her claims were distinct because they alleged misconduct greater than and different from the violation of the 33% guideline. *Id.* The court held that the fact the relator alleged greater misconduct was unavailing because the conduct was part of "the broader claim that defendant

submitted false claims to obtain federal funds" via the 5M0 grant. *Id.* Therefore, the court concluded that the relator's claims and the claims released were the same cause of action, and thus the realtor's claims were "foreclosed by the Settlement Agreement under principles of res judicata." *Id.* at 620.

For the same reasons in *Sarafoglou* and *Resnick*, res judicata bars Counts I and V here.

### III.   ALL COUNTS MUST BE DISMISSED FOR FAILING TO PLEAD FRAUD WITH PARTICULARITY AND OTHERWISE FAILING TO STATE A CLAIM

Fed. R. Civ. P. 9(b) requires a higher standard of pleading for fraud claims than is typically required under Rule 8(a)'s general pleading standard. *See Harrison*, 176 F.3d at 789. Rule 9(b) requires that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Yet, each of Soodavar's five counts fails to meet this higher standard and some do not even meet Rule 8(a)'s requirements as defined in *Iqbal* and *Twombly*.

To meet the requirements of Rule 9(b), an FCA plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. These facts are often referred to as the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal quotation marks and citation omitted). Below, we show how each count fails to meet these requirements.

First, we turn to a problem that infects all counts: Soodavar's failure to allege any details about any allegedly false claims submitted to the government. As noted above, the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004) (citation omitted); *Harrison*, 176 F.3d at 785; *see also United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013).

Thus, "the details of the actual presentation of false or fraudulent claims to the government can and must be plead with particularity in order to meet the requirements of Rule 9(b)." *Karvelas*, 360 F.3d at 228; *see also Takeda*, 707 F.3d at 456-58.  That means a plaintiff must plead at least some of the following information with respect to at least some of the allegedly false claims: "details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices." *Karvelas*, 360 F.3d at 233.  Soodavar does not provide any of these details for even a single invoice.  Because he fails to provide "any billing information," "such as copies of a single actual bill or claim or payment, amounts of any charges, actual dates of claims, [or] policies about billing . . . practices," Soodavar's complaint must be dismissed.  *United States ex rel. Rector v. Bon Secours Richmond Health Corp.*, No. 3:11-cv-38, 2014 WL 1493568, at *8 (E.D. Va. Apr. 14, 2014); *see also Virginia ex rel. Hunter Labs, LLC v. Quest Diagnostics, Inc.*, No. 1:13-CV-1129 (GBL/TCB), 2014 WL 1928211, at *6-8 (E.D. Va. May 13, 2014).

### A.    Count I is Pled Inadequately under Rule 9(b) and Otherwise

Count I alleges that, for the entire duration of TO 122, all of Unisys's CENTCOM FSEs fraudulently billed 56 hours of work per week when they worked only 40 hours per week. Soodavar's allegations completely lack the details required by Rule 9(b).

First, Soodavar fails to name a single employee who allegedly billed in this manner.  *See United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004) (complaint failed "to identify with specificity who precisely was involved in the fraudulent activity").  Soodavar claims that Unisys employees Richard Torres and Bryan Pope told him that this practice was "on the 'down low,'" Compl. ¶ 15, but he never alleges that either of them (or

anyone else, specifically) actually engaged in the practice.

Second, Soodavar alleges that "[i]n March 2010" "[w]hile in Kuwait, [he] observed that the employees worked only 5 days a week, 8 hours per day." *Id.* ¶¶ 13-14.  Yet, despite his limited time in one locale, he alleges, with no supporting explanation, that this conduct occurred continuously "from May 2007 to September 2011" throughout "the CENTCOM Unisys team," which also included FSEs working in Iraq and Afghanistan. *Id.* ¶ 20.  Two recent cases in this Court have rejected allegations based on extrapolations of this sort.

In *United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162, 2009 WL 2240331, at *6 (E.D. Va. July 23, 2009), the relator alleged that the defendant had failed to test and purify water at multiple military sites and fraudulently billed the government for those services.  The relator had witnessed such conduct only at two military sites.  The Court rejected the allegations as to the sites the relator had not visited because he failed "to include any information about the circumstances surrounding, or the personnel involved in," the conduct alleged to have occurred at the other locales.  *Id.* at *9.  The Court said that "[i]t is clear that . . . Relator is merely extrapolating from his personal knowledge about two specific sites in Iraq to obtain discovery regarding all of Defendant's other sites in Iraq."  *Id.*  Such allegations are "precisely the kind of fishing expedition that the Fourth Circuit sought to prevent in *Harrison.*"  *Id.*

Likewise, in *United States ex rel. Badr v. Triple Canopy, Inc.*, 950 F. Supp. 2d 888 (E.D. Va. 2013), a case involving allegations that a defense contractor falsified qualifications of security guard contractors, this Court dismissed allegations of conduct the relator extrapolated from his personal knowledge.  *Id.* at 901 ("[N]othing in Relator's Complaint establishes or creates a plausible inference that Relator was at the sites governed by these contracts and would thus have had personal knowledge of the alleged breaches at these sites. . . .  Without any

additional pre-discovery information to support his allegation regarding the [other] installations, Relator's claim fails."). On appeal, the Fourth Circuit affirmed, noting that unlike the allegations about the site the relator had seen, he provided no dates, specific actions taken on those dates, or the identities of personnel involved for the sites he had not personally visited. *United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 640 (4th Cir. 2015). Soodavar's allegations, extrapolated from his single experience in Kuwait in 2010, similarly fail.

Soodavar's Count I allegations also fail to meet Rule 9(b)'s particularity standard and *Iqbal*'s plausibility standard for an independent reason. Even if the CENTCOM employees were billing 56 hours but only working 40 hours, there is no indication that this would have resulted in the government being charged anything for the allegedly unworked sixteen hours. As previously discussed, Unisys FSEs recorded their time both to T&M and FFP sub-CLINs. Because FFP charges were set at a certain amount regardless of the actual time worked, the FFP portion of the invoice would not have looked any different if the FSE entered 16 allegedly unworked hours as FFP. Overcharges could not have occurred unless the FSEs recorded 16 allegedly unworked hours as T&M, but Soodavar fails to allege that this was the case. As a result, he has failed to allege plausibly that Unisys submitted a false claim, and he has failed to do so with the particularity required by Rule 9(b). *See Takeda,* 707 F.3d at 457 ("when a defendant's actions, as alleged and as reasonably inferred from the allegations, could have led, but need not necessarily have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment"); *United States ex rel. Bunk v. Birkhart Globistics GmbH & Co.*, 89 F. Supp. 3d 778, 790 (E.D. Va. 2014) (government failed to show "that a specific, identifiable claim was paid based on a prime rate that was inflated beyond what it would have otherwise been absent [the alleged fraud]").

2062827.1

### B.     Count II is Pled Inadequately under Rule 9(b)

Count II is equally devoid of the required particulars.  First, Soodavar alleges that "[f]rom April of 2007 until March of 2011, it was commonplace for Unisys to falsely report that employees were located in Iraq or Afghanistan when those same persons were actually residing in Kuwait."  Compl. ¶ 28.  According to the Complaint, the purpose of this alleged scheme was to increase an employee's salary with danger and hardship pay ("uplift pay") allegedly authorized for Iraq and Afghanistan, but not Kuwait, which was "reimbursed by the Army."  *Id*. Soodavar identifies only Richard Torres and Torres's wife as persons who allegedly utilized this scheme.  However, as with Count I, these allegations are totally unsupported by any details and lack any support for Soodavar's extension of his allegations regarding these two people to all of Unisys's CENTCOM team throughout the four-year life of TO 122.

Second, Soodavar alleges that "[f]rom April of 2007 to September of 2011, Unisys" violated certain "regulations by paying employees more LQA [Living Quarter Allowance] than they were entitled to be paid" because the payments exceeded the employees' actual expenses. *Id*. ¶¶ 34-36, 39-40.  He alleges that "approximately thirty overseas employees [received] LQA payments at any given time," *id*. ¶ 41, but does not say when these payments occurred, to which employees those payments were made, or whether any of those employees' actual LQA expenses were less than the LQA payments sought from the government.  Soodavar does not even allege how often these allegedly improper payments occurred or how much the Army purportedly was overcharged, other than to allege in conclusory fashion that it was "a significant sum."  *Id*.

Third, Soodavar alleges that "[f]rom April 2007 to September 2011, Unisys, instead of paying relocation costs reimbursing an employee for his actual costs, paid the employees a substantially inflated lump sum regardless as to the employee's true . . . costs."  *Id*. ¶ 44. Soodavar vaguely refers to one Unisys employee who allegedly received this benefit after a

24

move to Germany, *id*. ¶ 45, but does not identify the employee, provide a date (or even a year) for this alleged incident, or identify the employee's actual relocation costs that allegedly "were much less" than the "over $20,000" that Unisys billed to the government. *Id*. Not only is the single incident pled with insufficient detail, but Soodavar, once again, improperly extrapolates similar conduct to some unidentified group of employees for the entire life of TO 122.

### C.    Count III is Pled Inadequately under Rule 9(b) and Otherwise

Perhaps Soodavar's most egregious violations of Rule 9(b) appear in Count III.  One of Rule 9(b)'s principal purposes is to eliminate "fraud actions in which all the facts are learned through discovery after the complaint is filed." *Harrison*, 176 F.3d at 789.  That is exactly what Soodavar admits he hopes to do in Count III.  He alleges that "*[a]n investigation* of the list of . . . [140] Unisys employees who worked as [FSEs] *will show* the overwhelming *majority* of these employees were not qualified at the time of their hiring."  Compl. ¶ 57 (emphasis added).  This Count seeks to "rest primarily on facts [to be] learned through the costly process of discovery," which is "precisely what Rule 9(b) seeks to prevent."  *Wilson*, 525 F.3d at 380.  In addition, Soodavar never alleges that any of the 140 listed employees were hired or employed by Unisys during the period in question (May 2007 to September 2011).  *See* Compl. ¶¶ 57, 99.[8]

Separately, Count III must be dismissed because Soodavar fails to allege an "objective falsehood." *United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 472 F. Supp. 2d 787, 797

---

[8] Soodavar provides one example of a former employee convicted of a crime, *see* Compl. ¶ 53, but does not identify the employee, when he worked for Unisys (or even whether he worked there sometime during the relevant May 2007 to September 2011 time period), whether he worked on TO 122, or whether he was unqualified to do his job when he started his work for Unisys.  Soodavar's attempt to allege a set of egregious facts and pass them off as illustrative of widespread issues – regardless of whether they are connected to the scheme alleged – should be rejected. *See Harrison*, 176 F.3d at 789 (rejecting the relator's use of an illustrative example that was not alleged to be part of the fraudulent activity at issue in the complaint).  Although the employee in question did not work on TO 122 at all, but rather on a prior order, the point here is that Soodavar did *not allege* that the employee had any connection to TO 122.

2062827.1

(E.D. Va. 2007), *aff'd*, 562 F.3d 295 (4th Cir. 2009).  Under the FCA, "fraud may only be found in expressions of fact which '(1) admit[] of being adjudged true or false in a way that (2) admit[] of empirical verification.'"  *Harrison,* 176 F.3d at 792 (alterations in original, citation omitted). Differences of opinion or in contract interpretations and vague assertions that contract performance could have been better are insufficient to show falsity.  Here, because Soodavar has not pled that the contractual documents (or anything else) require any specific qualifications for employees under TO 122, he has not pled an objective falsehood.  *Cf. United States ex rel. Ubl v. IIF Data Sols.*, 650 F.3d 445, 448 (4th Cir. 2011) (contract specified "the education, experience, and skill requirements necessary for the . . . employee to be assigned to each category").

United States ex rel. Wilson v. Kellogg Brown & Root, 525 F.3d 370 (4th Cir. 2008), illustrates the objective falsehood requirement.  There, the relators alleged that the defendant failed to perform certain maintenance work, and therefore violated a contractual requirement that its vehicles "be maintained in a safe operating condition and good appearance."  *Id*. at 374-75. The court rejected the relators' claim, reasoning that it rested "not on an objective falsehood, as required by the FCA, but rather on Relators' subjective interpretation of [defendant's] contractual duties."  *Id*. at 377.  Because the relators' claims were premised on "general and relatively vague maintenance provisions," they simply "do not qualify as objective falsehoods and thus do not constitute false statements under the FCA."  *Id*.  "[B]as[ing] a fraud claim on nothing more than [relators'] own interpretation of an imprecise contractual provision . . . would render meaningless the fundamental distinction between actions for fraud and breach of contract."  *Id*. at 378; *see also Luckey v. Baxter Healthcare Corp*., 2 F. Supp. 2d 1034, 1048 (N.D. Ill. 1998), *aff'd*, 183 F.3d 730 (7th Cir. 1999) (rejecting plaintiff's claims that defendant failed to provide adequate blood product testing because "[t]here [was] no indication that the

contracts or regulation required the type of testing advocated by [the relator]").

In Count III, Soodavar has not alleged that Unisys violated a single contractual (or other) requirement.  Instead, he asserts only in a generic sense that the employees were unqualified, but "it is not exactly clear what would qualify as adequate (or inadequate)" qualifications under Soodavar's theory.  *Wilson*, 525 F.3d at 377.  Even if Unisys's employee selections "could have or should have been better" or "could be improved" (and there is no indication that is the case), that is not sufficient to establish falsity under the FCA.  *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1033 (D. Nev. 2006); *Luckey*, 183 F.3d at 733.

### D.      Count IV is Pled Inadequately under Rule 9(b) and Otherwise

Count IV relates to government-furnished property ("GFP") that Unisys allegedly lost. Soodavar claims "Unisys possessed millions of dollars of government equipment in managing the RF[ID] program" and "[o]n August 4, 2011, . . . knowingly delivered less tha[n] all of the property" and that the missing property "was worth $500,000."  Compl. ¶¶ 107-08.  He alleges that this conduct violated 31 U.S.C. § 3729(a)(1)(D), which imposes liability on anyone who "has possession, custody, or control of property . . . used, or to be used, by the Government and knowingly delivers . . . less than all of that . . . property."

Soodavar alleges that Unisys "lost assets" and that GFP went "missing."  Compl. ¶¶ 62, 63, 64, 65, 66, 68, 69.  But § 3729(a)(1)(D) imposes liability only when a defendant "has possession, custody, or control of" of the property – that is when the defendant tries to keep the property for itself – not when the defendant loses the property and no longer possesses it. Further, Soodavar alleges that Lockheed Martin (the government's successor contractor) "found numerous GFP not reported by Unisys."  *Id*. ¶ 62.  If Lockheed Martin has the GFP, it is difficult to understand how Unisys could have failed to "deliver" it.

Soodavar in Count IV also fails to provide the details required to satisfy Rule 9(b).  He

does not identify which GFP were lost.  Nor does he explain adequately how Unisys acted

knowingly (as opposed to merely negligently, which is not a violation of the FCA[9]) in losing the

GFP.  Instead, he vaguely blames it on "inexcusably poor processes in place and overall

mismanagement of GFP," Compl. ¶ 63, without identifying those processes or alleged

mismanagement or who at Unisys was responsible for those processes and mismanagement.

Soodavar's only allegation that Unisys acted knowingly is that an employee allegedly

"stated in an internal Unisys email dated July 6, 2011 that Unisys did not implement any

corrective action or processes" and lied about that fact in its "final report to [Contracting Officer]

Francoeur."  *Id.* ¶ 65.  But the July 6, 2011 email Soodavar references (attached as Ex. L) does

not say that Unisys was not implementing any corrective action or processes.  *See* Ex. L.  It says

that Unisys's corrective action was to get people to follow Unisys's existing policies and to have

management verify that those policies were being followed.  *Id.*  Moreover, the final report was

issued a month after the July 6, 2011 email referenced in paragraph 65 of the Complaint and it is

of course possible that Unisys implemented corrective action in the month between the July 6,

2011 email and the August 4, 2011 final report.

Soodavar also makes the broad, conclusory allegation that "Unisys regularly falsified its

SLA [Service Level Agreement] requirement," and therefore "should be assessed the full penalty

for every invoice paid based on false SLA representation, *i.e.*, 1.4% of each of the 55 or so

invoices paid under TO 122 (May of 2007 to March of 2011)."  Compl. ¶¶ 68-69.  But Soodavar

fails to identify any particular false representation.  Nor does Soodavar even attempt to explain

how any allegedly false representation could have led to "the full penalty" for any particular

---

[9] *See IIF Data Sols.*, 650 F.3d at 452 (the FCA is not intended to "punish honest mistakes or incorrect claims submitted through mere negligence") (internal quotation marks omitted); *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 734 (4th Cir. 2010) (same).

invoice, let alone "for *every* invoice." *Id.* ¶ 69 (emphasis added).  Such conclusory allegations do not satisfy Rule 9(b) and must be dismissed.  *See Takeda*, 707 F.3d at 457.

> ### E.       Count V is Pled Inadequately under Rule 9(b) and Otherwise

In Count V, regarding the alleged scheme under which CLIN 4 employees were recording their time to the FFP and T&M sub-CLINs according to predetermined percentages, Soodavar once again fails to identify a single employee who allegedly recorded his or her time in this manner, the specific dates on which this conduct allegedly occurred, or any details about how this alleged scheme was carried out.  Soodavar does not specify whether every individual employee working under CLIN 4 was allegedly billing time 70% as FPP and 30% as T&M, or whether the purported scheme required only that the employees billed 70% of their time as FFP and 30% as T&M in the aggregate.  Likewise, Soodavar fails to specify whether this supposed scheme called for a 70%-30% split every day, or only over the course of a longer period such as a month or year.  Without knowing these details, Unisys has no way to knowing which invoices or which time records within those invoices are alleged to be false.

The only specifics Soodavar offers in support of his allegations are two documents which he chose not to attach to the Complaint.  Those documents serve only to undermine the plausibility of his allegations.  Soodavar refers in paragraph 74 to a "manager's guide."  But that document (attached as Ex. M), says nothing about billing to the 4AB CLIN "regardless as to the engineers' actual time accrued."  Compl. ¶ 74.  Nothing in the document states – or even suggests – that the employees are to bill under a 70%-30% model, or any other predetermined percentages. *See* Ex. M.

Soodavar also alleges that Herr and Maria Lippart exchanged emails "to ensure that engineers were billing T&M for [sub-CLIN] 4AB according to the formula and not actual time accrued."  *Id.* ¶ 75.  That conclusory allegation is insufficient under *Iqbal* and *Twombly*, and

even more so under Rule 9(b).  It is also insufficient because there is no allegation that either

Herr or Lippart had control over the CLIN 4 employees' time records.  *See U.S. ex rel. Decesare*

*v. Americare in Home Nursing*, No. 1:05cv696, 2011 WL 607390, at *8 (E.D. Va. Feb. 10, 2011)

(finding no allegations that certain employees controlled the allegedly fraudulent actions at

issue).  In any event, the email exchange Soodavar appears to be referencing does not suggest in

any way that Herr and Lippart were trying to "ensure that engineers were billing T&M for 4AB

according to the formula and not actual time accrued."  Compl. ¶ 75.  Rather, the email exchange

(attached as Ex. N), reflects two employees attempting to analyze actual performance against

budgets.  *See* Ex. N.  There is no discussion about requiring employees to bill formulaically as

Soodavar alleges.[10]

## **CONCLUSION**

Unisys respectfully requests that the Court grant its Motion to Dismiss.

Dated:  January 25, 2016        /s/ Adam P. Feinberg
                                    Adam P. Feinberg (VSB No. 37331)
                                    Charles F.B. McAleer, Jr. (VSB No. 24430)
                                    James A. Bensfield*
                                    Jonathan D. Kossak*
                                    MILLER & CHEVALIER CHARTERED
                                    655 15th Street, N.W., Suite 900
                                    Washington, D.C. 20005
                                    (202) 626-5800 (telephone)
                                    (202) 626-5801 (facsimile)
                                    E-mail: afeinberg@milchev.com
                                                     cmcaleer@milchev.com
                                    (*) *pro hac vice* application forthcoming

                                    *Counsel for Defendant Unisys Corporation*

---

[10] Soodavar is not involved in the email exchanges discussed in this or the previous paragraph. Both documents were produced by Unisys in *Saunders*, which presumably explains how Soodavar's counsel came to possess them.

2062827.1

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that, on this 25th day of January, 2016, a true and genuine copy of

the foregoing was served on the following by ECF:

Max F. Maccoby, Esq.
Butzel Long, P.C.
1747 Pennsylvania Avenue, NW
3rd Floor
Washington, DC 20006
*Counsel for Relator Charles Soodavar*

Richard W. Sponseller, Esq.
Assistant United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314
*Counsel for the United States of America*

/s/ Adam P. Feinberg
Adam P. Feinberg (VSB No. 37331)
MILLER & CHEVALIER CHARTERED
655 15th Street, N.W., Suite 900
Washington, D.C. 20005
(202) 626-5800 (telephone)
(202) 626-5801 (facsimile)
E-mail: afeinberg@milchev.com

2062827.1