**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| United States of America *ex rel*. CHARLES SOODAVAR,<br><br>Plaintiff,<br><br>v.<br><br>UNISYS CORPORATION,<br><br>Defendant. | Civil Action No. 1:14-cv-1217 (TSE/TCB) |

**REPLY IN SUPPORT OF DEFENDANT UNISYS CORPORATION'S
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Adam P. Feinberg (VSB No. 37331)
Charles F.B. McAleer, Jr. (VSB No. 24430)
James A. Bensfield*
Jonathan D. Kossak*
MILLER & CHEVALIER CHARTERED
900 16th Street, N.W.
Washington, D.C. 20006**
(202) 626-5800 (telephone)
(202) 626-5801 (facsimile)
E-mail: afeinberg@milchev.com
        cmcaleer@milchev.com
(*) Admitted *pro hac vice*
(**) Note address change as of March 14, 2016

Dated:  March 16, 2016          *Counsel for Defendant Unisys Corporation*

Defendant Unisys Corporation ("Unisys") respectfully submits this reply brief in support of its Motion to Dismiss the Amended Complaint (ECF No. 32), and in response to the Opposition to the Motion to Dismiss the Amended Complaint (ECF No. 35) ("Opposition" or "Opp.") filed by Plaintiff/Relator Charles Soodavar ("Soodavar").

## I.      COUNT II MUST BE DISMISSED UNDER THE FIRST TO FILE BAR

### A.      The Fraud Alleged in Count II Has the Same Material Elements as the Fraud Alleged in *Saunders*

Soodavar concedes that his Count II "is similar to what had been alleged in the original complaint in *Saunders*."  Opp. at 4.  Yet he insists that for purposes of the first to file analysis, the Court should compare his Count II allegations only with those contained in the *Saunders* SAC.[1]  Under that comparison, he insists, his complaint alleges "a totally different type of fraud" than the one alleged in *Saunders*.  Soodavar is wrong for two separate reasons.

First, "the facts underlying [the *Saunders*] action," 31 U.S.C. § 3730(b)(5), are to be gleaned not from the latest-filed complaint in that case, but from *all* of the pleadings and "potentially" even from "the record compiled in the suit."  *United States ex rel. Chovanec v. Apria Healthcare Grp. Inc.*, 606 F.3d 361, 363 (7th Cir. 2010).  A narrow focus on the latest-filed pleading in the earlier case would undercut the purpose of the first to file analysis, which is "to determine 'whether the [subsequent complaint] alleges a fraudulent scheme the government already would be equipped to investigate.'"  *United States ex rel. Beauchamp v. Academi Training Ctr., Inc.*, 933 F. Supp. 2d 825, 835 (E.D. Va. 2013) (quoting *United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011)); *see also United States ex rel. Batty v. Amerigroup Illinois, Inc.*, 528 F. Supp. 2d 861, 874 (N.D. Ill. 2007) (considering the

---

[1] Abbreviated terms are defined in Unisys's Memorandum in Support of its Motion to Dismiss the First Amended Complaint (ECF No. 33) ("Mem.").

allegations in the original and amended complaints from the earlier-filed *qui tam* action because all of the allegations in the earlier-filed case "of which the government had notice and an opportunity to investigate should be considered in determining whether Plaintiff's case is duplicative").  Because the government received notice of all of the allegations made in each of Saunders's complaints, the first to file bar will be triggered if any of the allegations in any of those complaints have the same material elements of fraud as Count II here.[2]  Since Soodavar acknowledges that Count II mirrors the allegations in Saunders' original complaint, that count is "based on the facts underlying" *Saunders*.

Even if the Court were to accept Soodavar's suggestion and focus on the *Saunders* SAC, the first to file bar would still apply because Count II here shares the same material elements of fraud with one of the allegations in the *Saunders* SAC.  Soodavar's argument is based on his erroneous assertion that Saunders "abandoned" the red/blue and 50/50 plan allegations contained in the original complaint when he filed the *Saunders* SAC.  Opp. at 5.  Although Saunders did add new allegations, he kept the original allegations in his SAC and even moved for summary judgment on those allegations.  A cursory comparison of the *Saunders* SAC to Count II here makes clear that Saunders's original allegations (which Soodavar admits are similar to his) remained in the *Saunders* SAC:  both allege that TO 122 employees used "predetermined percentages" to split their time between FFP and T&M, "regardless of the work performed despite the fact that T&M work is only supposed to be billed for actual time accrued."  *Compare* FAC ¶ 78 *with Saunders* SAC ¶ 96; *compare also* FAC ¶ 33 *with Saunders* SAC ¶¶ 55-58.[3]

---

[2] The government investigated Saunders's allegations between April 6, 2012, and June 24, 2013, when the seal was lifted and the original complaint was ordered to be served.  *See* 31 U.S.C. § 3730(a), (b).  Thus, it does *not* "make[] sense to focus" only on a different complaint.  Opp. at 3.

[3] Soodavar's description of the allegations from the *Saunders* SAC (*see* Opp. at 4-7) is incomplete because it addresses only the allegations added for the first time in that complaint.

Further, Saunders's own filings demonstrate that his original red/blue and 50/50 plan allegations remained in the *Saunders* SAC. On August 14, 2014, Saunders moved for leave to file his SAC because he claimed to have "learned new facts that strongly support his original fraud theory and provide him with an alternative theory of relief." *Saunders*, Pl.'s Mem. in Support of Motion for Leave to Amend at 3, ECF No. 93 (Ex. A). In addition to using the purportedly new facts for his new, alternative theory, the *Saunders* SAC "incorporate[d] these facts in support of the same fraud claim averred in his [earlier complaint], namely, [that] the red/blue scheme directed FSEs to bill predetermined percentages of T&M without regard to actual time accrued or what tasks FSEs were working on in order to increase T&M . . . ." *Id*. at 4. "This theory *remains unchanged* by Saunders['s] new allegations." *Id*. at 5.

Then, on October 24, 2014 – a month *after* this case was filed – Saunders moved for summary judgment on the original red/blue and 50/50 plan allegations. *See Saunders*, Pl.'s Mem. in Support of Mot. for Summary J., ECF No. 177 (filed under seal) ("*Saunders* MSJ Mem."). That motion was based solely on the allegation that Unisys employees billed "according to the predetermined percentage established by the Red/Blue Plan and (subsequently) by the 50/50 Plan, without regarding to the amount of time that the FSEs were actually devoting to each subCLIN." *Id*. at 7; *see also id*. at 10, 11, 19, 22.[4] Although Saunders's *alternative* theory might have been that Unisys was trying to "reduc[e] the amount of work allocated to

---

Those allegations are irrelevant. The *original* allegations that remained in every version of Saunders's complaints trigger the first to file bar here.

[4] Saunders admitted that his summary judgment motion did *not* include "a broader fraudulent scheme" the facts of which "are substantially more complicated," *i.e.*, the new allegations. *Saunders* MSJ Mem. at 1. His motion was limited to "simple and straightforward" allegations regarding "false invoices and time records," *i.e.*, the allegations of billing according to predetermined percentages under the red/blue and 50/50 plans. *Id*.; *see also* Opp. at 3 (describing the similar "simple and straightforward" "time-card fraud" alleged in Count II here).

T&M" so as "to bill the government *less* for T&M than the amount of T&M work that was in fact performed," Opp. at 4, Saunders's summary judgment motion was based on the opposite theory.  He alleged "that the intent behind [the red/blue and 50/50 plan] was not to lower T&M billings" as Unisys had claimed, but "rather, it was intended to increase them" and that it resulted in a $20.1 million overcharge to the government.  *Saunders* MSJ Mem. at 14.

Lastly, Soodavar admitted that he is basing Count II on the same allegations as *Saunders* by asserting that "Unisys did the same thing under CLIN 1 and 2 according to the red/blue and 50/50 billing schemes," as Unisys allegedly did under CLIN 4.  Compl. ¶115, ECF No. 1.

### B.   Soodavar's Additional Attempts at Distinguishing Count II Are Unavailing

Soodavar attempts to distinguish Count II from *Saunders* because the Unisys employees were working under different CLINs of TO 122.  Opp. at 6; FAC ¶ 57(c).  As explained in Unisys's opening brief, this distinction is irrelevant under the "material elements" test.  *See* Mem. at 12-14.  Soodavar is drawing virtually the same distinction that was rejected outright by the Fourth Circuit in *Carter*:  that the earlier and later-filed cases involved "different types of employees" working "in different divisions" of the same company.  *United States ex rel. Carter v. Halliburton Co.,* 710 F.3d 171, 182 (4th Cir. 2013).

Soodavar also argues that the first to file bar does not apply to Count II because successful prosecution of his claim would not include a recovery that would be duplicative of Saunders's recovery.  He suggests – wrongly – that the critical inquiry under the first to file rule is "whether the later-filed case would recover damages that could have been recovered by the earlier-filed case."  Opp. at 7 & n.9.  However, if the possibility of a separate monetary recovery could save a later-filed suit from the first to file bar, *Carter* would have come out differently.  Again, the earlier and later-filed actions in *Carter* raised allegations involving

"different types of employees" who worked "in different divisions."  710 F.3d at 182.  The fraud at issue in both the earlier and later-filed cases was the "submission of false time sheets in support of claims for false payment," *id*., and undoubtedly there would have been no double recovery if Carter had been allowed to press his lawsuit alleging the submission of *different* false time sheets from *different* employees than those at issue in the earlier cases.  Yet, Carter's case was barred because it was based on the same material elements of fraud as the earlier-filed cases.  "If the later-filed complaint alleges the same type of wrongdoing as the first . . . the fact that the later complaint describes a different time period or geographic location *that could theoretically lead to a separate recovery* does not save it from . . . § 3730(b)(5)."  *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 (D.D.C. 2003) (emphasis added).[5]

Next, Soodavar insists that *Saunders* did not "encompass" the allegations in Count II because the precise allegations here – involving different employees and CLINs – were not included in the *Saunders* case.  Opp. at 8.  He insists that Count II would be barred if, for instance, Saunders had alleged a companywide fraud at Unisys.  *Id*. at 8-9.  But Soodavar's position amounts to an "identical facts" test, imposing the first to file bar only when the facts in the earlier and later-filed actions overlap perfectly.  That approach was rejected by the Fourth Circuit in *Carter* and by virtually every court to consider the issue. 710 F.3d at 181-82.

Further, Soodavar's approach is inconsistent with the principle that if the allegations in the earlier-filed action could have prompted the government to investigate and discover the misconduct alleged in the later-filed case, the later case should be barred.  *Carter*, 710 F.3d at 182 (the earlier "allegations of fraud provide the government with enough knowledge of

---

[5] Although a duplicative recovery is not required to trigger the first to file bar, there would be such a recovery here.  As explained in Section II below, Unisys has already paid a settlement amount representing FCA statutory penalties for 31 monthly TO 122 invoices alleged to be false in *Saunders*.  Soodavar now seeks another FCA penalty for each of those very same invoices.

essential facts of the scheme to discover *related* fraud") (emphasis added); *accord United States ex rel. Szymoniak v. ACE Sec. Corp.*, No. 0:13-CV-00464-JFA, 2014 WL 1910876, at *5 (D.S.C. May 12, 2014).[6]  In *Carter*, the Fourth Circuit found that the false billing scheme involving KBR truckers was sufficient to prompt the government to "investigate billing practices across the company" so as potentially to discover the related wrongdoing by ROWPU and trade workers. 710 F.3d at 182.  Similarly, the fraud alleged in *Saunders* – improper billing according to set percentages by Unisys FSEs under CLINs 1 and 2 – was sufficient to prompt the government to investigate whether Unisys engineers under CLIN 4 "work[ing] in all the same regions of the world as FSEs" (FAC ¶ 28), were doing "the same thing," as Soodavar alleges.  Compl. ¶ 115.[7]

### C.    Soodavar's Filing of an Amended Complaint After *Saunders* Was Resolved Does Not Shield Count II from the First to File Bar

Soodavar insists that even if Count II shares the same material elements of fraud as the scheme alleged in *Saunders*, the first to file bar should not apply to the FAC because that complaint was filed after *Saunders* was dismissed, thereby curing the jurisdictional defect in his original complaint.  For support, he cites cases that Unisys has already demonstrated should not be followed.  *See* Opp. at 10; Mem. at 9-11.  Instead, the Court should follow the recent

---

[6] The inquiry is not whether the government *actually* investigated the related fraud; only, as Soodavar notes, whether the earlier allegations "could have reasonably led the government to discover" the fraud alleged in the later action.  Opp. at 9; *see also Chovanec*, 606 F.3d at 365. Also, Soodavar falsely claims that Unisys represented in disclosures to the Office of the Inspector General "that the fraud [at issue in *Saunders*] was limited to CLIN 1 and 2."  Opp. at 9. Unisys never disclosed *any* fraud, because there was not any.  As Soodavar's counsel acknowledged when he represented Saunders, "[t]he fact of the matter is that Unisys never disclosed to the OIG anything remotely constituting fraud or fraudulent activity in its preliminary and final reports."  *Saunders*, Pl.'s Opp. to Mot. to Dismiss at 19, ECF No. 37 (Ex. B).

[7] Soodavar misreads *Carter* by assuming that the earlier complaints there had "broad or general allegation[s]" that included the fraud alleged by Carter.  Opp. at 9 & n.16.  But *Carter* is clear that the earlier and later filed cases were different in that they involved "different types of employees [] in different divisions."  *Carter*, 710 F.3d at 182.

decisions in *United States ex rel. Carter v. Halliburton Co.*, No. 1:11-cv-602, 2015 WL 7012542 (E.D. Va. Nov. 12, 2015) and No. 1:11-cv-602, 2016 WL 634656 (E.D. Va. Feb. 17, 2016), which summarize the cases holding that a jurisdictional defect under § 3750(b)(5) cannot be cured by an amended complaint and articulate why the competing authorities are incorrect.

Soodavar also contends that his position is supported by the Supreme Court's decision in *Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007), which he says addresses "the effect of filing an amended or supplemental complaint after changed circumstances have eliminated the jurisdictional bar that had initially existed." Opp. at 10. That is wrong. In *Rockwell*, changed circumstances *created* a jurisdictional bar that did not exist when the original complaint was filed. 549 U.S. at 473. Soodavar seizes on *Rockwell*'s statement that "'when a plaintiff files a complaint . . . and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.'" Opp. at 10 (quoting *Rockwell*, 549 U.S. at 473-74). But as the Fourth Circuit recently cautioned, courts should not "mechanically appl[y]" that statement and should instead examine the rationale behind *Rockwell*. *United States ex rel. Beauchamp v. Academi Training Ctr., LLC*, No. 15-1148, 2016 WL 758001, at *6 (4th Cir. Feb. 25, 2016). The correct view is that *Rockwell* "did not suggest that the original complaint becomes irrelevant for jurisdictional purposes once an amended complaint is filed. To the contrary, the Court stated that its holding was consistent with [t]he rule that subject-matter jurisdiction depends on the state of things at the time of the action brought." *Id.* at *7 (internal quotation marks omitted); *see also 16 Front St. LLC v. Mississippi Silicon, LLC*, No. 1:14-cv-183, 2015 WL 9424148, at *3-4 (N.D. Miss. Dec. 22, 2015) (collecting authorities that *Rockwell* "does not suggest that a plaintiff can establish jurisdiction by amendment when jurisdiction did not previously exist").

Soodavar also relies on the First Circuit's decision in *United States ex rel. Gadbois v.*

*PharMerica Corp.*, 809 F.3d 1 (1st Cir. 2015), and on the Fourth Circuit cases to which it cites, *see* Opp. at 11, but none of those decisions support his argument.  In *Carter*, 2016 WL 634656, this Court specifically rejected *Gadbois*'s analysis.  The court concluded that the First Circuit gave insufficient weight to the plain wording of § 3730(b)(5), *id*. at \*2, which states that "no person   . . . may . . . *bring* a related action based on the facts underlying" a then-pending action.  31 U.S.C. § 3730(b)(5) (emphasis added); *see also United States ex rel. Shea v. Verizon Comm., Inc.*, No. 09-1050, 2015 WL 7769624, at \*10 (D.D.C. Oct. 6, 2015).[8]

## II.     COUNT II IS BARRED BY RES JUDICATA

The parties agree on the fundamentals of the Fourth Circuit's three-prong res judicata framework.  They agree that the stipulated dismissal in *Saunders* was a final merits judgment (prong 1) and that the parties are identical in both cases (prong 2).  The parties even agree that *Ohio Valley Envtl Coalition v. Aracoma*, 556 F.3d 177 (4th Cir. 2009), and *Keith v. Aldridge*, 900 F.2d 736 (4th Cir. 1990), provide the framework for the "same cause of action" analysis (prong 3).  That prong is met if the second suit "arises out of the same transaction or series of transactions as the claim resolved by the prior judgment."  *Ohio Valley*, 556 F.3d at 210 (internal quotation marks omitted).  The parties differ over whether language in the *Saunders* settlement triggers an exception to the rule.  Soodavar argues that the settlement terms do so by negative implication (*i.e.*, by not mentioning CLIN 4).  But the better reading of the Fourth Circuit's precedent is that express preservation is required.  Because no language in the *Saunders* settlement expressly preserves claims involving CLIN 4 and because the same allegedly false claims and the same general fraudulent scheme are at issue, Count II is barred by res judicata.

---

[8] The Fourth Circuit cases that *Gadbois* cites are not applicable.  They are not FCA cases, let alone first to file cases, and thus the statutory language and purpose at issue here were not at play.  *Cf. Beauchamp*, 2016 WL 758001, at \*7 (looking to the "purpose" of another FCA jurisdictional bar).

The Fourth Circuit has held that when analyzing the "same cause of action" prong, a "court need not find that the plaintiff in the second suit is proceeding on the same legal theory he or his privies advanced in the first suit." *Id*. at 210. "As long as the second suit 'arises out of the same transaction or series of transactions as the claim resolved by the prior judgment,' the first suit will have preclusive effect." *Id*. However, the Fourth Circuit recognizes an exception to this rule – *i.e.*, when parties consent to the splitting of a claim by "'[e]xpress agreement.'"[9] *Keith*, 900 F.2d at 740. An express agreement requires explicit language.

In both *Ohio Valley* and *Keith*, the Fourth Circuit identified claims expressly preserved and concluded that they were not barred by res judicata. In *Ohio Valley*, the settlement agreement "explicitly reserved plaintiffs' right to challenge the Corps' valley fill permit authority in the future." 556 F.3d at 211. In *Keith*, the plaintiff had "expressly reserve[d] [his] claim for attorney's fees," and thus "knew how to preserve a claim for future litigation." 900 F.2d at 741. But because the plaintiff had failed to expressly preserve his other claims arising out of the same transaction, he had failed to save them from being barred by res judicata. *Id*. at 741-42.

Soodavar argues to the contrary that according to *Keith*, "an intention to limit the scope of preclusion . . . need not be spelled out explicitly." Opp. at 15. Soodavar argues further that "*expressio unius est exclusio alterius*," *id*. at 14, a doctrine of negative implication,[10] shows that the parties here intended to preserve claims relating to CLIN 4 because only CLINs 1 and 2 are explicitly mentioned in the settlement agreement's summary description of "Covered Conduct."

---

[9] The argument below assumes *arguendo* that such an exception applies here. However, that is far from clear because the *Saunders* settlement was not incorporated into any court order. *See* Mem. at 18 n.7.

[10] *See William v. Gonzales*, 499 F.3d 329, 340 (4th Cir. 2007) ("William's . . .is an argument by negative implication . . . having roots in the maxim *expressio unius est exclusio alterius*.").

*Id*.  Soodavar's misreads *Keith*.  The plaintiff in *Keith* made the same "negative implication"

argument as Soodavar and the Fourth Circuit explicitly rejected it.  900 F.2d at 741.

Thus, in the two Fourth Circuit cases Soodavar relies upon, *Ohio Valley* and *Keith*, the

court countenanced exceptions to the general transaction and occurrence approach only where

the settlement *expressly* preserved a specific claim or set of claims.  Nowhere in the *Saunders*

settlement is there any express preservation of additional FCA actions involving the TO 122

invoices at issue or CLIN 4.  For this reason alone, Unisys has the better res judicata argument.

But, in addition, Unisys also has the support of the decisions in *United States ex rel. Sarafoglou*

*v. Weill Med. Coll. of Cornell Univ.*, 451 F. Supp. 2d 613 (S.D.N.Y. 2006) and *United States ex*

*rel. Resnick v. Weill Med. Coll. of Cornell Univ.*, No. 04 CIV 3088, 2010 WL 476707 (S.D.N.Y.

Jan. 21, 2010).  *Sarafoglou* and *Resnick* are particularly instructive because of their striking

similarities to this case, *see* Mem. at 19-21, and because the Second Circuit follows a modified

res judicata approach that is the same as the Fourth Circuit's when a dismissal with prejudice is

based on a settlement agreement.[11]  Soodavar suggests that those cases are inapposite because

"in neither case did the court consider whether the parties had by their settlement terms shown an

intention to limit the preclusive scope of the judgment."  Opp. at 16.  Again, Soodavar is wrong.

In *Sarafoglou* the court specifically examined the plaintiff's argument that "the false

claims that she is bringing in her amended complaint were not covered by the [first complaint] or

the settlement."  451 F. Supp. 2d at 620.  The plaintiff argued that because the settlement terms

released claims only with respect to "Covered Conduct," which was defined by reference to the

first complaint, *id*. at 619, the settlement agreement could not have a preclusive effect over the

amended complaint, which included greater misconduct not alleged in the first complaint.  *Id*. at

---

[11]  *See Greenberg v. Bd. of Governors of the Fed. Reserve Sys.*, 968 F.2d 164, 168 (2d Cir. 1992)
(measuring a settlement's "preclusive effect . . . by the intent of the parties") (citation omitted).

620.  The court in *Sarafoglou* rejected this argument, noting that both the first complaint's limited allegations and the amended complaint's expanded allegations were "part of the broader claim that defendant submitted false claims to obtain federal funds."  *Id*. at 621.

Likewise, the *Resnick* court undertook the same analysis and reached the same conclusion in examining the preclusive effect of a settlement agreement whose scope was limited to the "Covered Conduct" as alleged in the first complaint.  2010 WL 476707 at *2; *see id*. at *5 ("Although Resnick asserts that her claims with respect to the Settled Grants arise from different false statements related to the Settled Grants and were excluded from the release accompanying the Settlement, they are still part of the same transaction or occurrence.").

As in *Sarafoglou* and *Resnick*, the same exact allegedly false claims are at issue here:  the monthly consolidated TO 122 invoices that Unisys submitted to the government.  In connection with these claims, Unisys has already paid the government $170,500.  *See* Mem., Ex. D at 3 (ECF No. 33-5).  That amount represents the minimum $5,500 statutory FCA penalty for each of the 31 invoices Saunders alleged to be false under his red/blue and 50/50 plan allegations.  *See Saunders* MSJ Mem. at 18-19.  Soodavar now seeks a second FCA penalty for those very same invoices, on the theory that different aspects of the invoices are false.  Res judicata prohibits such an attempt.[12]  If anything, res judicata is more appropriate here than in *Sarafoglou* and *Resnick* because here the same general fraudulent scheme is at issue (in addition to the same claims).

*Ohio Valley*, *Keith*, *Sarafoglou,* and *Resnick* all place the onus on the party seeking to preserve claims to insert express language to that effect.  Soodavar suggests the opposite – that "had the parties wished to apply the transaction and occurrence test, they could have used language making that intent clear," Opp. at 16 – but fails to cite any case law in support of his

---

[12] Assessing two penalties for the same allegedly false claim would also violate the substantial case law permitting only one penalty per claim.  *See* Section IV, *infra*.

position.  *Id.*  Because the *Saunders* settlement contains no express preservation of claims related to CLIN 4, Count II is barred by res judicata.

## III.   SOODAVAR FAILS TO PLEAD FRAUD WITH PARTICULARITY AND OTHERWISE FAILS TO STATE A CLAIM

Soodavar's attempts to salvage Counts I and II from dismissal for inadequate pleading are ineffective.  He barely endeavors to keep Count I alive at all, dispelling any notion that he intended to allege an objective falsehood in that count.  Instead, he relies only on the worthless services theory of liability, but does so merely by restating the basic elements of the theory in conclusory fashion, which is wholly insufficient to satisfy his pleading burden.  In defending Count II, Soodavar asks this court to draw implausible inferences without describing any specific instance in which any Unisys employee instructed any CLIN 4 engineer to artificially bill time to T&M rather than FFP.  In the absence of any such specific factual allegations, Soodavar cannot satisfy either Rule 9(b) or *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

### A.   Count I Is Pled Inadequately under Rule 9(b) and Otherwise

After reducing his allegations about unqualified workers from as many as 140 FSEs in the original complaint to nine in the FAC, Soodavar has further reduced his allegations by conceding that he "do[es] not rely on the specified employees' lack of qualifications as an independent basis for the claim.  Therefore, it is irrelevant whether the amended complaint adequately identified an objective falsehood."  Opp. at 24-25.  Soodavar then suggests that he has met the pleading standard by pointing to allegations that do nothing more than state in conclusory terms that the nine employees' services were worthless:

> the plaintiff must allege and prove that the employee's supposed services were . . . provided in such a deficient manner as to be practically worthless. . . .  And that is precisely what the amended complaint alleges:  it describes the employees in question as having "performed no services having any value to the government,

and that were equivalent to providing no services at all."

*Id*. at 25 (quoting FAC ¶ 22) (other quotations and citations omitted).  But a plaintiff cannot survive a Rule 12(b)(6) challenge by parroting the elements of a theory of liability.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) ("legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled-facts").  Soodavar's conclusory statements that the nine FSEs performed worthless services do not suffice under the normal pleading standards, much less so under Rule 9(b).

### B.      Count II Is Pled Inadequately under Rule 9(b) and Otherwise

One of the key deficiencies in Soodavar's FAC is that he provides "general allegations" of billing practices and "engages in summary pleading of the false claims," but "does not allege the 'who, what, when, where, and how' of a single false claim."  *United States ex rel. Hunter Labs, LLC v. Quest Diagnostics, Inc.*, No. 1:13-CV-1129, 2014 WL 1928211, at *8 (E.D. Va. May 13, 2014); *see also id*. at *7 (collecting cases, and suggesting that *United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451 (4th Cir. 2013), is consistent).[13]  Soodavar argues that he does not have to provide these details as long as he provides notice of the "'particular circumstances for which [Unisys] will have to prepare a defense at trial,'" and demonstrates "'substantial pre-discovery evidence of those facts.'"  Opp. at 18 (quoting *Harrison v. Westinghouse Savanna River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).  In addition, Soodavar suggests that he only needs to allege sufficient facts from which a court could "reasonably infer that the percentages were intended to govern the recording of time [for CLIN 4 engineers], independently of the actual number of hours worked."  Opp. at 18.

---

[13] Both counts are deficient; we address it here since Soodavar discusses it only for Count II.

Soodavar cannot fail to provide any specific information about a single allegedly false claim, and then rely only on inferences to satisfy his pleading burden. Even under *Twombly*'s pleading standard, a complaint "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." 550 U.S. at 555 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004)). This standard is only heightened under Rule 9(b). As the court in *Harrison* noted, Rule 9(b) not only helps to put defendants on notice and precludes actions in which all the facts are learned in discovery, but it also "exists to protect defendants from frivolous suits" and "protects defendants from harm to their goodwill and reputation." 176 F.3d at 784 (internal quotation marks omitted).

Here, Soodavar not only fails to provide any information regarding the allegedly false claims, but he also alleges no facts regarding who concocted this alleged fraudulent billing scheme, why it was instituted, who at Unisys knew about it, or which specific engineers abided by it. *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (Rule 9(b) requires plaintiffs to identify with specificity the "'who, what, when, where, and how' of the alleged fraud") (internal quotation marks and citation omitted).

When a relator fails to provide details of a single example of a specific false claim being presented to the government, courts' antennas should rise. In *Takeda*, the relator suggested that "to meet the requirements for pleading a fraud claim under the Act, a relator need only allege the existence of a fraudulent scheme that supports the inference that false claims were presented to the government." 707 F.3d at 456. The Fourth Circuit "decline[d] to adopt Relator's argument for a more lenient application of the rule." *Id*. Instead, it specifically warned against drawing "inferences . . . unsupported by the stated facts." *Id*. at 460.

Soodavar admits that his allegations depend on a series of inferences. For example, he

admits that the Bid Model "spreadsheet by itself [does not] prove[] that time was billed based on predetermined percentages." Opp. at 20. He argues, however, that it is "certainly consistent" with fraud, *id*., because Unisys succeeded in hitting its 70/30 goal. Soodavar contends that "one could reasonably infer [from these allegations] that the percentages were intended to govern the recording of time, independently of the actual number of hours worked on each subCLIN." *Id*. But without pleading specific facts of misconduct, Soodavar at most creates "a suspicion" of a false claim. *Twombly*, 550 U.S. at 555. Even assuming Unisys's overall results matched the 70/30 split in the Bid Model as Soodavar alleges, there is an alternative, reasonable explanation, *e.g.*, that Unisys's Bid Model was well-crafted and turned out to be an accurate estimate of the actual work done. *Takeda*, 707 F.3d at 460. To counter this reasonable explanation, Soodavar must allege particular facts that plausibly suggest Unisys managers directed CLIN 4 engineers to bill time to T&M when the engineer was actually doing FFP-type work. Despite all of the emails cited in the FAC, Soodavar fails to allege a single incident in which such a direction was given.

Perhaps the closest Soodavar comes is Unisys manager Stephen Hurley's September 18, 2008 email to CLIN 4 engineer Jim West. *See* FAC ¶ 41; Opp. at 21. Hurley informed West that he was "not charging [his] time correctly" because his "position is one of support and sustainment," and that he therefore "should be charging 75% to T&M and 25% to FFP." *Id*. But this email is innocuous unless West was actually spending less than 75% of his time on T&M tasks – something neither the email nor any other allegation in the FAC suggests was the case.[14]

---

[14] In addition, Soodavar alleges that the Bid Model estimated that West would spend 100% of his time on T&M tasks, *see* FAC ¶ 35, so Hurley's email is inconsistent with Soodavar's allegation that CLIN 4 engineers like West were directed to adhere to the estimates in the Bid Model. And, even after Hurley's email, West was billing less T&M than the 100% estimated in the Bid Model or the 75% mentioned in Hurley's email. *See id*. ¶ 42. West was not the only CLIN 4 biller whose time entries did not match the estimates in the Bid Model – many other engineers listed in paragraph 42 of the FAC are hundreds of hours off those estimates. *See id*.

**IV.  SOODAVAR'S CLAIMS FOR FCA PENALTIES FOR EACH ALLEGEDLY FALSE TIME CARD ENTRY MUST BE DISMISSED**

In seeking FCA penalties not only for each allegedly false claim but also for each allegedly false record or statement within such claims, Soodavar asks this Court to do what no court to our knowledge has ever done and what numerous courts – including the Fourth Circuit in *United States v. Grannis*, 172 F.2d 507 (4th Cir. 1949) – have expressly rejected.

Soodavar tries to avoid *Grannis* by arguing that it "is not good law" in light of the Supreme Court's decision in *United States v. Bornstein*, 423 U.S. 303 (1976).  Opp. at 27.  But *Bornstein* strongly supports Unisys's, not Soodavar's, position.  The FCA penalties issue in *Bornstein* was more complicated than the one here because it involved the fraudulent acts of a subcontractor which, in turn, caused the prime contractor to submit false claims to the government.  However, as to the simpler issue "[i]n cases involving prime contractors," the Court, citing favorably to *Grannis* and other similar cases, stated that "the number of imposable forfeitures has generally been set at the number of individual false payment demands that the contractor has made upon the government."  *Bornstein*, 423 U.S. at 309 n.4.  Indeed, as noted below, numerous cases cite to *Bornstein* (and *Grannis*) in rejecting Soodavar's position.

Further, the Supreme Court's decision with respect to the subcontractor issue also precludes Soodavar's entitlement to penalties based on false records.  *Bornstein* involved the sale of radio tubes by a subcontractor (United) to a prime contractor (Model) which incorporated them into a final product (radio kits) for the government.  *Id*. at 307.  "The tubes that United sent to Model under this subcontract were not of the required quality, but were falsely marked by United to indicate that they were."  *Id*.  Those falsely marked tubes were sent by United to Model in "at least 21 boxes," "in three separately invoiced shipments."  *Id*.  "397 of those falsely marked tubes" were used by Model in the radio kits that were shipped to the United States under

the prime contract, for which Model submitted to the government 35 claims for payment.  *Id*.
The Court held that the 35 claims that the prime contractor submitted were irrelevant to the
penalties that should be assessed against the subcontractor.  *Id*.  The Court instead looked to the
subcontractor's conduct and assessed three penalties – one for each of the invoices the sub-
contractor sent to the prime contractor.  *Id*. at 313.  Notably, the Court did not assess 397
penalties (one for each falsely marked tube) or even 21 penalties (one for each box of falsely
marked tubes).  If Soodavar's theory were correct, these additional penalties would have been
assessed.  *See, e.g.*, *Miller v. United States*, 550 F.2d 17, 23-24 (Ct. Cl. 1977) (discussed below).

Although the Court need not look beyond *Bornstein* and *Grannis*, the other case law cited
in Unisys's opening brief overwhelmingly supports the position that separate penalties are not
appropriate for allegedly false records or statements within an allegedly false claim.  Soodavar
dismisses these cases as "wrongly decided" or "simply irrelevant."  Opp. at 27, 29.  As discussed
below, those quotes are true of the cases Soodavar cites, not the ones on which Unisys relies.

The FCA's "false record or statement" provision imposes liability for using or making a
false record or statement in order to obtain payment on a false or fraudulent claim.  *See* 31
U.S.C. § 3729(a)(1)(B); *id*. § 3729(b)(4); 31 U.S.C. § 3729(a)(2) (1986); 31 U.S.C. § 231 (1976).
Under both the current and former versions of that provision, the record or statement need not
accompany or be incorporated into the false claim and need not have been submitted to the
government at all (that was true even under prior versions of the statute, when the claim itself did
have to be submitted to the government).  *See id*.; *see also Allison Engine Co. v. United States ex
rel. Sanders*, 553 U.S. 662, 671 (2008).  In this case, the allegedly false records or statements –
the time entries – are *part of* the claim for payment submitted to the government.  As with
*Grannis*, the cases cited in Unisys's opening brief analyzed precisely that situation and each one

17

held that a penalty is imposed for each false claim, but not each record or statement therein.

Like *Grannis*, *United States v. Woodbury*, 359 F.2d 370 (9th Cir. 1966), is directly on point and was cited favorably by the Supreme Court in *Bornstein*.  *See* 423 U.S. at 309 n.4.  That case involved ten allegedly false claims or "applications" for payment.  *Woodbury*, 359 F.2d at 372-73, 377-78.  The government pressed for more than ten penalties on the "theory that certain documents attached to the [ten] applications made to the government for funds were also false, and that each such document is a separate false 'bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition' within the meaning of the False Claims Act['s]" false records or statements provision.  *Id*. at 377-78.  The court reviewed the allegedly false records attached to the claims and concluded that five were false.  *Id*. at 378.  As a result, the question arose whether the court should assess ten penalties (one for each false claim) or fifteen penalties (one for each claim and one each for the five false records attached to those claims).  The court, citing *Grannis* and a number of other cases, held "that the authorities preclude [the] ruling" urged by the government.  *Id*.  The court noted that in each of the cited authorities, "[i]t does not appear that any separate awards were made based upon the number of false papers contained in or attached to a particular claim."  *Id*.  Accordingly, the Ninth Circuit held that the government was not entitled to a separate penalty for the false records.  *Id*.

Like *Grannis* and *Woodbury*, other cases cited in Unisys's opening brief address the precise question of whether separate penalties can be assessed for false records or statements within the claims, and all answer that question in the negative.  *See Miller*, 550 F.2d at 23 n.11 & 24 (assessing penalties for five consolidated billings, but not the 11 invoices incorporated therein, because "[p]enalizing for eleven invoices *plus* the five consolidations of the same eleven invoices seems clearly a miscarriage of justice.") (citing *Bornstein* and *Woodbury*); *United States*

*v. Krizek*, 111 F.3d 934, 938-40 (D.C. Cir. 1997) (assessing penalties based on the number of claim forms submitted to the government, not the number of false billing codes within those forms) (citing *Bornstein*, *Grannis*, and other cases); *United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.*, No. 04-cv-01224-MSK-CBS, 2010 U.S. Dist. LEXIS 97018, at *9-18 (D. Colo. 2010) (relying primarily on *Bornstein* and *Krizek* and holding that a penalty was due for each "monthly consolidated form" but not for each false component therein, because the consolidated forms were the claims on which penalties are assessed).

In sum, *Bornstein*, *Grannis*, *Woodbury*, *Miller*, *Krizek*, and *Maxwell* all stand for the same basic proposition:  FCA penalties apply to each overall claim for payment, but not every individual record or statement within the claim.  Nothing in the statute suggests a different result.

Soodavar does not cite a single case where an FCA penalty was imposed for a record or statement within or attached to a claim for payment, and we do not know of any such case. Soodavar cites only one case where the court awarded separate penalties for false records or statements, *United States v. Bd. of Educ. of City of Union City,* 697 F. Supp. 167, 170 (D.N.J. 1988), but there the false record or statements were *not* contained in or attached to the claim for payment.  In addition to being inapposite, *Union City* also was wrongly decided because even when false records or statements are submitted separately from the false claim, there still can be only one penalty.  As the leading treatise on the FCA explains, *Union City* fails to address cases like *Bornstein* and *Woodbury* and is based on authorities that predate those cases and that "appear to offer, at best, weak support for the argument that the number of penalties that may be imposed upon a False Claims Act defendant may exceed the number of actual false 'claims' or demands for payment."  1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 3.05[B] (at p.3-101) (4th ed. 2015) (Ex. C hereto).  *Union City* also "ignored controlling precedent within its

own circuit."  *Id.* (citing *United States v. Rohleder*, 157 F.2d 126, 130-31 (3d Cir. 1946)).

The Boese treatise answers the question of "whether the government is entitled to a penalty for each false record or statement" as follows:  "Almost all courts are in complete agreement regarding this question – the number of permissible penalties under the Act is limited to the number of actual demands for payment or false claims."  *Id.*; *see also United States v. Cooperative Grain and Supply Co.*, 476 F.2d 47, 61-62 (8th Cir. 1973) ("At one point, [the government] ask[ed] for a $2,000 forfeiture for each false document signed by each producer, no matter how many false documents are involved in one entire loan transaction.  With this concept we cannot agree."  The court instead permitted a single penalty for each claim); *BMY-Combat Systems Division of Harsco Corp. v. United States*, 44 Fed. Cl. 141, 150 & n.4 (1998) (although BMY "had submitted false records in support of its false claims, which is a separate violation of the FCA, 31 U.S.C § 3729(a)(2)," "[s]uch records . . . do not equate to separate penalties when the records and the claim support the same false demand for money") (citing *Miller, Woodbury*).

Finally, this is not an election of remedies issue that must await a verdict.  Soodavar, as a matter of law, cannot obtain a judgment for penalties for each allegedly false time entry within each claim.  This purely legal issue can be decided now, just as several Courts of Appeals have ruled on the issue even though the matter required a remand for further proceedings on the assessment of the penalties.  *See Krizek*, 111 F.3d at 940; *Cooperative Grain*, 476 F.2d at 66.

## CONCLUSION

Unisys respectfully requests that the Court grant its Motion to Dismiss.

Dated:  March 16, 2016         /s/ Adam P. Feinberg
                               Adam P. Feinberg (VSB No. 37331)
                               Charles F.B. McAleer, Jr. (VSB No. 24430)
                               James A. Bensfield*
                               Jonathan D. Kossak*
                               MILLER & CHEVALIER CHARTERED
                               900 16th Street, N.W.

Washington, D.C. 20006**
(202) 626-5800 (telephone)
(202) 626-5801 (facsimile)
E-mail: afeinberg@milchev.com
         cmcaleer@milchev.com
(*) Admitted *pro hac vice*
(**) Note address change as of March 14, 2016

*Counsel for Defendant Unisys Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on this 16th day of March, 2016, a true and genuine copy of

the foregoing was served on the following by ECF:

Max F. Maccoby, Esq.
James F. Gehrke, Esq.
Butzel Long, P.C.
1747 Pennsylvania Avenue, NW
3rd Floor
Washington, DC 20006
*Counsel for Relator Charles Soodavar*

Richard W. Sponseller, Esq.
Assistant United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314
*Counsel for the United States of America*

/s/ Adam P. Feinberg
Adam P. Feinberg (VSB No. 37331)
MILLER & CHEVALIER CHARTERED
900 16th Street, N.W.
Washington, D.C. 20006**
(202) 626-5800 (telephone)
(202) 626-5801 (facsimile)
E-mail: afeinberg@milchev.com
(**) Note address change as of March 14, 2016