**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ) | |
| CHARLES SOODAVAR, ) | |
|    **Plaintiff,** ) | |
| ) | **Case No. 1:14-cv-1217** |
|        v. ) | |
| ) | |
| UNISYS CORPORATION, ) | |
|    **Defendant.** ) | |

## MEMORANDUM OPINION

Relator in this False Claims Act ("FCA")[1] case alleges that defendant Unisys Corporation ("Unisys") defrauded the United States by presenting claims for payment and supporting documentation to the federal government for services (i) that were of no value (Count I) and (ii) that overcharged the federal government (Count II). Specifically, relator alleges that Unisys hired certain employees who were so unqualified that their work was of no value to the United States and that Unisys implemented a fraudulent scheme by which it instructed certain employees to record inaccurate information on their timecards so that Unisys could maximize profits under its contract with the United States Army.

Unisys filed a motion to dismiss relator's Amended Complaint for lack of jurisdiction and for failure to state a claim under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., arguing that Count I fails to state a claim for relief and that Count II (i) is precluded by the FCA's first-to-file jurisdictional bar, (ii) is barred by *res judicata*, and (iii) fails to state a claim for relief. The motion was fully briefed and argued. For the reasons that follow, the motion must be granted and the Amended Complaint must be dismissed.

---

[1] 31 U.S.C. § 3729 *et seq.*

**I.**

The pertinent facts may be succinctly stated.[2] This action arises out of Unisys's work as

the prime contractor for the United States Army's world-wide radio-frequency identification

network services ("RFID"). From 2007 to 2011, relator Charles Soodavar managed the day-to-

day operations under this contract—Task Order 122 ("TO 122")—in Europe and Africa. The

work under TO 122 was divided into multiple Contract Line Item Numbers ("CLINs"), three of

which are relevant here. Each of the three relevant CLINs was further subdivided into two sub-

CLINs based on the nature of the work performed. Specifically, an "AA" sub-CLIN involved

new installations or software developments, and an "AB" sub-CLIN involved maintenance of

existing installations or software. Work under an AA sub-CLIN was billed based on a set fee

regardless of the hours worked, but work under an AB sub-CLIN was billed based on the number

of hours worked as reflected in employee time records.

The first CLINs relevant to this action are CLINs 1 and 2. Under both of these CLINs,

employees known as field service engineers were responsible for installing RFID sites and

maintaining the operational readiness of these sites. The key difference between CLIN 1 and

CLIN 2 was geographic, namely that field service engineers within the continental United States

operated under CLIN 1 while field service engineers outside of the continental United States

operated under CLIN 2. In Count I, relator alleges that Unisys routinely hired unqualified

personnel to work as field service engineers under CLINs 1 and 2 and that these employees, as a

---

[2] For purposes of defendant's motion to dismiss under Rule 12(b)(6), it is appropriate that the factual allegations in the Amended Complaint are taken as true, and it is also appropriate to take judicial notice of additional facts. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (a motion to dismiss may consider "matters of which a court may take judicial notice"); *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 827 (4th Cir. 2010) (factual allegations accepted as true). For purposes of defendant's motion to dismiss under Rule 12(b)(1), it is also appropriate to consider material outside of the pleadings. *See Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

result of their lack of qualifications, rendered services that were of no value to the United States. Thus, relator alleges that any claim for payment submitted to the federal government for work performed by these unqualified employees was a claim worthless services.

The third relevant CLIN is CLIN 4, under which software engineers provided development and support services for RFID sites. Development services were to be billed under sub-CLIN 4-AA, while support services were to be billed under sub-CLIN 4-AB. Count II of the Amended Complaint alleges that Unisys submitted to the United States fraudulent invoices that falsely reported the amount of work performed under each sub-CLIN. Specifically, relator alleges that rather than report the hours employees actually worked, Unisys reported hours according to a predetermined formula: 70% of labor was reported under sub-CLIN 4-AA and 30% under sub-CLIN 4-AB. This formula mirrored Unisys's contract bid to obtain TO 122, which had proposed that 70% of labor under CLIN 4 would be allocated to sub-CLIN 4-AA, which used a fixed fee payment model, and 30% of the labor would be allocated to sub-CLIN 4-AB, which used a time and materials payment model. The Amended Complaint alleges that once performance on the contract was underway, Unisys realized that in practice less than 30% of the labor under CLIN 4 was actually for AB-qualifying work and that because of the time and materials billing model under sub-CLIN 4-AB, if Unisys did not bill 30% of labor under sub-CLIN 4-AB, then Unisys would in effect be leaving money on the table. Thus, the Amended Complaint alleges that in order to capture the full amount of money that the federal government allocated for AB payments, Unisys misrepresented labor hours that should have been billed under sub-CLIN 4-AA as labor hours under sub-CLIN 4-AB. In other words, the Amended Complaint alleges that Unisys instructed its CLIN 4 software engineers to bill their work as 70% AA and 30% AB, regardless whether this ratio accurately reflected the labor allocation, which

3

had the effect of billing the government for more CLIN 4-AB work than Unisys actually performed. This billing scheme allegedly lasted from April 2008 until October 2011.

Importantly, this is not the first FCA lawsuit to allege that Unisys committed fraud under TO 122. In *United States ex rel. Saunders v. Unisys*, No. 12-cv-379 (E.D. Va.) ("*Saunders*"), the various complaints alleged a billing scheme similar to the one alleged here with respect to CLIN 4, the difference being that the relator in *Saunders* alleged that the scheme occurred under CLINs 1 and 2. Indeed, the *Saunders* Second Amended Complaint ("SAC") alleged that Unisys "bill[ed] [time and materials] work according to predetermined percentages regardless of the work performed despite the fact that [time and materials] is only supposed to be billed for actual time accrued." *See Saunders* SAC (D. Mem. Supp., Ex. C), ¶ 96. Thus, as with the fraudulent invoicing allegation in Count II of this lawsuit, the *Saunders* SAC alleged that Unisys engaged in a fraudulent scheme to manipulate its billing to conform to the bid model submitted to win TO 122. *See id.* ¶¶ 20-21, 24, 43. According to the *Saunders* SAC, the billing scheme under CLINs 1 and 2 lasted from approximately April 2008 until October 7, 2010. *Id.* ¶¶ 54-55, 61, 70.

In December 2014, Saunders, Unisys, and the United States reached a settlement agreement by which the United States released Unisys from FCA liability for "Covered Conduct," which the Settlement Agreement defined as the fraudulent billing scheme under CLINs 1 and 2. *See* Settlement Agreement (D. Mem. Supp., Ex. D), ¶¶ R-4, 3. In light of the Settlement Agreement, the parties dismissed *Saunders* with prejudice on December 26, 2014. *See* Stipulation of Dismissal (D. Mem. Supp., Ex. E). Unisys now contends that the *Saunders* Settlement Agreement precludes relator's CLIN 4 claim in Count II.

## II.

Count I of the Amended Complaint alleges a worthless services claim related to CLINs 1 and 2, in essence alleging that certain field service engineers under CLINs 1 and 2 were so unqualified that their work was worth nothing. Unisys, citing the now-familiar *Iqbal-Twombly* decisions,[3] argues that dismissal is warranted because Count I fails to allege facts supporting a plausible inference of worthless services liability.[4]

Although the FCA imposes liability for claiming payment from the United States for a worthless service, courts routinely recognize that a relator can bring a worthless services claim only if "the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." *United States ex rel. Davis v. U.S. Training Center, Inc.*, 498 F. App'x 308, 315 n.11 (4th Cir. 2012) (quoting *Mikes v. Straus*, 274 F.3d 687, 703 (2d Cir. 2001)) (internal quotations omitted).[5] As the Seventh Circuit has persuasively explained, "[i]t is not enough to offer evidence that the defendant provided services that are worth some amount less than the services paid for." *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 710 (7th Cir. 2014). In other words, "[s]ervices that are 'worth less' are not 'worthless.'" *Id.* This distinction between worthless services and services that are merely "worth

---

[3] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (similar).

[4] It is well settled that "[i]n addition to meeting the plausibility standard of *Iqbal*, fraud claims under the [FCA] must be pleaded with particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure." *United States ex rel. Nathan v. Takeda Pharms. N.A., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013). Because Count I of the Amended Complaint does not pass muster under *Iqbal*, it is unnecessary to assess compliance with Rule 9.

[5] *See also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468-69 (6th Cir. 2011) (quoting the same language); *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824 (8th Cir. 2009) (same).

less," applied here, points persuasively to the conclusion that Count I fails to state a claim for worthless services.

Analysis of a worthless service claim must begin by identifying the "service" at issue. The Amended Complaint indicates that under the relevant CLINs the government was paying for the installation and maintenance of RFID sites. Thus, the proper analytical focus for assessing the claim is whether such RFID sites were installed and maintained in a manner that provided some value to the federal government. Instructive precedent from other circuits teaches and confirms that the analysis of a worthless service claim must focus on the precise service for which the government is paying. *See Chesbrough*, 655 F.3d at 468 (focusing on specific medical tests); *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001) (focusing on specific laboratory test data). To be sure, where the service provided is worthless to the government, it necessarily follows that the employee work hours expended to provide the service are also worthless to the government—time spent providing something of no value is time wasted. Yet, it does *not* follow that where a few worthless employees are working on a team, the services provided by the entire team are worthless. In other words, where, as here, the United States pays for a single set of services that requires work by multiple employees— such as installing and maintaining RFID sites—a focus only on certain individual employees rather than the overall effectiveness of the services rendered by all employees misses the forest for the trees.

Given the foregoing, it is pellucid that the Amended Complaint fails to state a claim for worthless services. With regard to the installation and maintenance of the RFID sites, the Amended Complaint alleges that "[t]he consequence of Unisys' hiring unqualified engineers was that the...team performed well below expectations," not that the team did not perform at all. Am.

Comp. ¶ 19. To the contrary, the work under the contract was apparently performed well enough that the United States Army never discovered the unqualified employees "because a small number of employees who were actually qualified were bearing the brunt of the work." *Id.* ¶ 20. In other words, the Amended Complaint concedes that RFID sites were being installed and maintained, but alleges that the services were performed at a level below the value the government was paying under TO 122 because certain employees were unqualified and therefore did not pull their weight. In this respect, relator bases his worthless services claim on services that were merely "worth less" than what the government paid. Such a theory is insufficient to state a claim for relief under the FCA. *Cf. Absher*, 764 F.3d at 710 ("Services that are 'worth less' are not 'worthless.'"). To conclude otherwise would inappropriately transform a "dispute involving contractual performance...into a *qui tam* FCA suit." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373 (4th Cir. 2008).

Relator argues that because CLINs 1 and 2 contained time and materials billing arrangements, the result should somehow be different. This is incorrect. To be sure, if the Amended Complaint alleged that certain employees performed no work but nevertheless billed time under sub-CLINs 1-AB and 2-AB, then a valid FCA claim for fraudulent invoicing might exist. But that is not what the Amended Complaint alleges in Count I. Instead, the Amended Complaint recognizes that the allegedly worthless employees were working, but simply argues that they added no value. *See, e.g.,* Am. Comp. ¶ 14 ("Unisys routinely hired non-qualified individuals so that it could bill their labor hours."). Simply put, the Amended Complaint does not suggest that the allegedly unqualified employees were just sitting idly all day.[6] And to the extent

---

[6] Nor do the facts relator proffers to support leave to amend save the claim. In fact, relator proffers that five of the nine allegedly worthless employees accompanied competent field service

relator intends to allege that the services actually performed added no value at all, the allegations are implausible. *Cf. United States ex rel. Badr v. Triple Canopy, Inc.*, 950 F. Supp. 2d 888, 898 (E.D. Va. 2013) ("There may be some inherent value retained in a service that is provided by an unqualified employee compared to a complete inability to use a product that is rendered defective."). Indeed, any services that advanced the goals of TO 122 in any respect, no matter how small, had *some* value—even answering the telephone to take a message is a type of productivity.[7]

At its core, relator's theory is that Unisys is liable for fraud because it hired certain employees who did not pull their weight, who made the RFID teams less efficient, and who decreased the overall value of the teams working under CLINs 1 and 2. Yet, the government still received the services for which it paid, namely the installation and maintenance of RFID sites. Although the government may well have gotten more bang for its buck if all CLIN 1 and 2 employees had been well qualified, the employment of unqualified persons under CLINs 1 and 2 merely rendered the overall work "worth less," not "worthless." *See Absher*, 764 F.3d at 710 ("Services that are 'worth less' are not 'worthless.'"). Because relator's allegations in Count I of the Amended Complaint fail to state a claim for worthless services liability, and because relator's proffered facts in support of leave to amend similarly fall short of stating a viable worthless

---

engineers on assignments. *See* P. Supp. Mem. (Doc. 41) at 5. Another two employees were allegedly performing services, albeit poorly, and a third apparently learned over the course of his first year how to add value and thereafter did so. *See* Am. Comp. ¶ 22h (Edwin Humphrey "performed...poorly"); *id.* ¶ 22i (Ali Briki's "performance as a [field service engineer] was...poor"); *id.* ¶ 22c (for Michael Bennett, "only the first year of work had no value").

[7] Even as to the employee who allegedly "performed no services," relator proffers facts in support of leave to amend that undercut the allegations. *Compare* Am. Comp. ¶ 22g (Janice Torres "performed no services") *with* P. Supp. Mem. at 5 (Janet Torres "performed no [field service engineer] services"—which is different from performing no services at all—and also took a two-week work-related trip to Iraq, presumably to perform services).

services claim, Count I must be dismissed with prejudice.[8] *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 121 (4th Cir. 2009) (leave to amend may be denied where the amendment is futile).

### III.

In Count II, the Amended Complaint advances a fraudulent invoicing theory, alleging that Unisys fraudulently submitted invoices that did not accurately reflect the work performed under CLIN 4, thereby causing the United States to overpay. Unisys seeks dismissal of this claim on three grounds: (i) that there is no subject matter jurisdiction under § 3730(b)(5), (ii) that the claim is barred by *res judicata*, and (iii) that Count II is insufficiently pled. For the reasons that follow, there is no subject matter jurisdiction over Count II, and Count II must be dismissed without prejudice to refiling a new lawsuit. For the sake of completeness, Unisys's *res judicata* argument is considered in the alternative. Given the results reached on these issues, it is unnecessary to address the sufficiency of the allegations.

### A.

Because it is well settled "that Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case," Unisys's jurisdictional challenge is appropriately addressed first. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). Under § 3730(b)(5), known as the first-to-file bar, "[w]hen a person brings an action under [the FCA], no person other than the Government may...bring a related action based on the facts underlying the pending action." This provision is jurisdictional. *See United*

---

[8] It also bears reiteration that neither the allegations in the Amended Complaint nor the proffered facts in support of leave to amend state a valid claim for a fraudulent invoicing theory of FCA liability. That is, the facts as presented to not suggest that Unisys claimed payment for hours when the allegedly worthless employees were not working.

*States ex rel. Carter v. Halliburton Co.*, 710 F.3d 171, 181 (4th Cir. 2013) ("[I]f an action is later

filed that is based on the facts underlying [a] pending case, the court must dismiss the later case

for lack of jurisdiction."). Importantly, the Supreme Court has recently reaffirmed that when

applying § 3730(b)(5), courts should give the words used their "ordinary meaning" even when

doing so "would produce practical problems." *Kellogg Brown & Root Servs., Inc. v. United

States ex rel. Carter*, 135 S. Ct. 1970, 1978-79 (2015).

     The jurisdictional analysis under § 3730(b)(5) is governed by the "material elements

test." *Carter*, 710 F.3d at 182. Under this test, "a later suit is barred if it is based upon the 'same

material elements of fraud' as the earlier suit" even though the later suit may not involve

identical facts and details. *See id.* Notably, the goal of the material elements test it to prevent less

vigilant whistleblowers from using immaterial factual variations to allege fraudulent activity

already known to the government. *See id.* Thus, where the allegations of fraud in an earlier suit

"provide the government with enough knowledge of essential facts of the scheme to discover

related fraud," actions on the related fraud are barred. *See id.*[9]

     Unisys correctly argues that Count II is barred because it was filed while *Saunders* was

pending. As the Supreme Court recently held, as used in § 3730(b)(5) "[t]he term 'pending'

means '[r]emaining undecided; awaiting decision.'" *Kellogg*, 135 S. Ct. at 1978. Under this

definition, *Saunders* was "pending" between April 6, 2012, when the original Complaint was

filed, and December 26, 2014, when the parties filed a stipulation of dismissal. Relator filed the

instant lawsuit in that timeframe, specifically on September 16, 2014. Yet, the parties dispute

---

[9] *Accord United States ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1209 (D.C. Cir. 2011)
(observing that under the "same material elements of fraud" analysis, courts "must determine
whether the [later complaint] alleges a fraudulent scheme the government already would be
equipped to investigate based on the [earlier complaint]").

whether the allegations in *Saunders* were based on the same material elements of fraud as the instant lawsuit. In Unisys's view, the evolution of the allegations over the course of the *Saunders* litigation establish that the government was aware of the fraud asserted here in Count II. Relator, in turn, argues that when the instant action was initiated, the *Saunders* SAC alleged a fraudulent scheme different from the scheme alleged here, which bars the application of § 3730(b)(5).[10]

1.

Relator first argues that because the fraudulent scheme alleged in the *Saunders* SAC is different from the scheme alleged here in Count II, § 3730(b)(5) does not bar Count II. As relator explains, the scheme alleged in Count II of this action is simple: Unisys engaged in time-card fraud in order to maximize the number of hours billed under CLIN 4-AB, which resulted in Unisys's charging the government for more time and materials work than Unisys actually provided. In contrast, the fundamental purpose of the time-card scheme alleged in the *Saunders* SAC was to shift billing from the AB sub-CLINs to the AA sub-CLINs so as to prevent the contracting officer from learning that Unisys was performing significantly less AA sub-CLIN work than it proposed in its bid model.[11] In short, relator argues that the *Saunders* SAC alleged a

---

[10] It is worth noting at the outset the relator's exclusive focus on the *Saunders* SAC to the exclusion of other *Saunders* pleadings is unpersuasive. The fundamental purpose of the material elements test is to determine what fraud "the government already would be equipped to investigate," which necessarily requires analysis of any source of information the government received in the earlier action. *See Batiste*, 659 F.3d at 1209. In this respect, courts have recognized that analysis under § 3730(b)(5) can encompass even "the record compiled" in the earlier lawsuit, including earlier versions of the complaint. *See United States ex rel. Chovanec v. Apria Healthcare Grp., Inc.*, 606 F.3d 361, 363 (7th Cir. 2010).

[11] The record reflects that the *Saunders* SAC continued to allege that the purpose of the time-card scheme under CLINs 1 and 2 was "to enlarge T&M [AB sub-CLIN] billing." *See Saunders* SAC ¶ 6. Indeed, Saunders's expert witness claimed "[t]hat Unisys desired to increase the amount of time charged to T&M [the AB sub-CLINs]" and "intended to capture the entire amount of CLINs 1AB and 2AB." *See Saunders* P. Ex. Report (D. Mem. Supp., Ex. H) at 10. Because

11

type of fraudulent inducement (*i.e.*, concealing facts that would have resulted in the reduction of the contract price or the re-competition of the contract entirely), whereas the fraud alleged in Count II of this action is straightforward misrepresentation in order to procure unearned payments.

This argument, which is based on the distinction between the *type of fraud* alleged, is unpersuasive. To begin with, a focus on the theory of fraud is inconsistent with the statutory language of § 3730(b)(5), which expressly focuses on "the facts," not the legal theory. Moreover, relator cites no authority for the proposition that the material elements test focuses on distinctions as to the theory of the fraud rather than the facts of the fraud. Indeed, it is difficult to see how the "material elements of fraud" that constitute the focus of the material elements test can be anything other than the *factual* bases for the fraud. After all, to speak of the "elements" of fraud is to speak of factual matters, namely (i) a material misrepresentation, (ii) scienter, (iii) reliance, and (iv) resulting harm. *See United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010) (stating the elements of an FCA claim). Further, a focus on the theory of fraud rather than the facts of fraud would deprive § 3730(b)(5) of much of its force because one set of facts can often give rise to multiple theories of fraud. *See, e.g., Lee*, 245 F.3d at 1053 (observing that a common set of facts could support either a false certification or worthless services claim). Thus, a difference in the *scheme* alleged is insufficient to avoid § 3730(b)(5)'s subject matter jurisdiction bar. As the text of the provision makes clear and as the provision's underlying purpose requires, the focus must be on the commonality of the facts in the earlier and later cases.

---

defendant's § 3730(b)(5) argument is a challenge to subject matter jurisdiction under Rule 12(b)(1), such "evidence outside the pleadings" is appropriately considered. *Velasco*, 370 F.3d at 398.

**2.**

Relator next argues that Count II does not arise from the same facts as the *Saunders* complaints. In this respect, relator emphasizes three distinctions between Count II and the *Saunders* SAC. First, the CLINs at issue are different, and Unisys's scheme under CLIN 4 involved overcharging the government whereas Unisys's scheme under CLINs 1 and 2 involved the failure to disclose cost data to the contracting officer. Second, noting that under the material elements test "an examination of possible recovery...aids in the determination of whether the later-filed complaint alleges a different type of wrongdoing on new and different material facts,"[12] relator argues that because the *Saunders* SAC focused on CLINs 1 and 2, any recovery in this action would have been unavailable in *Saunders*. Third, relator argues that the allegations in *Saunders* do not encompass the allegations in Count II of this action. In this regard, relator notes that in many cases invoking § 3730(b)(5) as a bar to subject matter jurisdiction, the allegations in the earlier lawsuit were broad enough to encompass the facts of the later filed action. Here, relator argues, the *Saunders* SAC only ever focused on CLINs 1 and 2, so any fraud under CLIN 4 was not encompassed in the *Saunders* allegations.

Relator's factual arguments fail to persuade. At the most basic level, the allegations in *Saunders* and in Count II of the instant action allege a time-card scheme by which Unisys sought to maximize its billing under AB sub-CLINs.[13] The schemes alleged here and in *Saunders* involve the same contract, the same task order, the same locations, the same timeframe, and even

---

[12] *United States ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 (D.D.C. 2003).

[13] It is worth emphasizing that, as noted earlier, relator's argument that the scheme alleged in *Saunders* involved fraudulently inflating AA billing rather than AB billing is contradicted by the record in *Saunders*. *See supra* n.11.

the same scheming managers.[14] The only difference between the fraud alleged under CLINs 1 and 2 and the fraud alleged under CLIN 4 is the type of employee involved: field service engineers under CLINs 1 and 2 versus software engineers under CLIN 4. Yet, as the Fourth Circuit held in *Carter*, where the allegations point to a "systematic practice of overbilling the government for hours worked by...employees," factual distinctions as to the type of employee or the employee's location are immaterial. 710 F.3d at 182.

Relator's argument that the allegations in *Saunders* do not encompass the allegations in Count II here—such that the *Saunders* complaints did not allege a systematic practice of overbilling—similarly fails. In the original *Saunders* Complaint, the relator alleged broadly that

> Unisys overcharged the U.S. Army Product Manager Joint-Automatic Identification Technology ("the Army") at least $13,474,000 on Task Order 122 ("TO 122") from February of 2008 until May of 2010 by applying a charging methodology that was implemented as a formula. TO 122 was a combination Time and Materials ("T&M") and Firm Fixed Price Award Fee ("FFP") CLINs for a service installing, supporting, and monitoring the Army's world-wide radio-frequency identification ("RFID") network.

*Saunders* Comp. ¶ 3. Thus, the original *Saunders* Complaint contained at least one allegation suggesting that the time-card scheme was occurring throughout TO 122. Although relator is correct that the allegations in *Saunders* subsequently focused exclusively on CLINs 1 and 2, the operative question is whether any allegation "provid[ed] the government with enough knowledge of essential facts of the scheme to discover related fraud." *Carter*, 710 F.3d at 182. And as the Seventh Circuit has observed in applying § 3730(b)(5), "[t]he allegations...are what they are." *Chovanec*, 606 F.3d at 365. In light of the general allegation of time-card fraud under TO 122

---

[14] *Compare, e.g.,* Am. Comp. ¶¶ 34 (identifying Douglas Herr as a relevant manager); 52a (identifying James Hayes as a relevant manager); 82 (alleging an April 2008 to October 2011 timeframe) *with, e.g., Saunders* SAC ¶¶ 43 (identifying Herr and Hayes as relevant managers); 3 (alleging a March 2008 to October 2010 timeframe).

and the specific allegations that this fraud was occurring under at least two separate CLINs, the government had sufficient information to make a further investigation into fraud under other CLINs "likely," which *Carter* teaches is sufficient to trigger the § 3730(b)(5) jurisdictional bar. *See* 710 F.3d at 182. Simply put, the allegations in Count II of the instant action are encompassed in the broad allegation in Paragraph 3 of the *Saunders* Complaint, and the specific allegations of fraud under CLINs 1 and 2 were sufficient to tip off the federal government that other aspects of TO 122 may also have been infected with fraud. Because the purpose of § 3730(b)(5) is to bar actions based on "the same fraudulent scheme already made known to the government," and because the government had reason to investigate the fraud under CLIN 4 after the *Saunders* Complaint, § 3730(b)(5) applies here to bar Count II.

Relator's final factual argument—that relator does not stand to recover for fraud for which Saunders already recovered—does not alter the analysis. As relator's own cited authority makes clear, "an examination of possible recovery *merely aids*" in the material elements test analysis. *Ortega*, 240 F. Supp. 2d at 13 (emphasis added). And as *Ortega* recognizes,

> [i]f the later-filed complaint alleges the same type of wrongdoing as the first, and the first adequately alleges a broad scheme encompassing the time and location of the later filed, the fact that the later complaint...could theoretically lead to a separate recovery does not save it from the absolute first-to-file bar of § 3730(b)(5).

*Id.* For the reasons already discussed, the original *Saunders* Complaint alleged a sufficiently broad scheme to inform the government of possible fraud under CLIN 4. Thus, even though *Saunders* ultimately focused only on the fraud under CLINs 1 and 2, the fact that Saunders's potential recovery may have been limited does not overcome the fact that the government knew enough information to discover the related fraud alleged in Count II here.[15]

--------

### 3.

In a final attempt to save Count II from dismissal under § 3730(b)(5), relator argues that by filing an Amended Complaint after *Saunders* was no longer pending, he has cured any jurisdictional defect. Relator's argument in this regard fails for two reasons. In part, relator's argument conflates a facial challenge to subject matter jurisdiction on the one hand and a factual challenge on the other. Moreover, portions of relator's argument are foreclosed by controlling Fourth Circuit authority.

As the Fourth Circuit has explained, "a defendant may challenge subject matter jurisdiction in one of two ways." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, the defendant argues that the facts as alleged in the complaint fail to establish a basis for subject matter jurisdiction. *See id.* In a factual challenge, the defendant attacks the truth of the factual predicate of subject matter jurisdiction. *See id.* The jurisdictional challenge presented here is factual, not facial. *Accord United States ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 848 (D. Md. 2013) (treating a § 3730(b)(5) challenge as factual). As the plain language of § 3730(b)(5) makes clear, a person may not "bring" an "action" while a factually related action is "pending." Whether an action is brought in contravention of § 3730(b)(5) is a question of fact. As already discussed, *Saunders* was a related action for purposes of the material

---

[15] Relator further represents that Saunders did not know about the CLIN 4 fraud or else Saunders would have pursued that fraud in his own case. This argument is unavailing, as the proper focus is not on what Saunders knew but on what the government had reason to know in light of the allegations. *See Carter*, 710 F.3d at 182; *Batiste*, 659 F.3d at 1209. In this respect, even if Saunders intended Paragraph 3 of his original Complaint to refer only to the fraud under CLINs 1 and 2, that does not change the fact that, taken at face value, the allegations in the original *Saunders* Complaint were sufficient to equip the government with the information necessary to investigate fraud under the remainder of TO 122. *Cf. Chovanec*, 606 F.3d at 365 ("The allegations...are what they are," and § 3730(b)(5) analysis does not "turn on whether the United States put those facts to their best use.").

elements test, and *Saunders* was pending when this action was filed. Moreover, there can be little doubt that "[t]o 'bring' an action...has a settled customary meaning in the law, and refers to the initiation of legal proceedings in a suit." Black's Law Dictionary 174 (5th ed. 1979).[16] Thus, relator—as a matter of fact—commenced this lawsuit on September 16, 2014, while *Saunders* was pending. It follows that § 3730(b)(5), by its plain language, bars subject matter jurisdiction as to Count II.

Relator's cited authorities do not compel a contrary conclusion. Relator cites *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007), for the proposition that "when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction." Yet, *Rockwell* is inapposite here; the cited rule applies to *facial* subject matter jurisdiction challenges, not *factual* subject matter jurisdiction challenges. *See id.* at 473. Indeed, *Rockwell* was clearly a facial jurisdictional challenge. *See id.* (acknowledging that in *Rockwell* jurisdiction turned on "the relator's allegations"). Moreover, "*Rockwell* demonstrates that a plaintiff may amend himself or herself out of jurisdiction by withdrawing allegations that appeared in the original complaint, but did not state that a court may acquire jurisdiction through amendment." *Carter*, --- F. Supp. 3d ---, 2015 WL 7012542, at *12 (internal quotations omitted). Here, the jurisdictional defect is not that relator failed to allege facts creating a basis for jurisdiction, but that relator—as a matter of fact—commenced his lawsuit while *Saunders* was pending. In sum, *Rockwell* does not apply here.

---

[16] *Accord Goldenberg v. Murphy*, 108 U.S. 162, 163 (1883) ("A suit is brought when in law it is commenced."); *Carter*, 710 F.3d at 183 ("Following the plain language of the first-to-file bar, [relator's] action will be barred...if [an earlier] case was pending when [relator] filed suit."); *United States ex rel. Carter v. Halliburton Co.*, --- F. Supp. 3d ---, 2015 WL 7012542, at *11 (E.D. Va. Nov. 12, 2015) ("A plaintiff does not 'bring an action' by amending a complaint, '[o]ne brings an action by commencing suit.'") (quoting *Chovanec,* 606 F.3d at 362).

17

Relator next cites the First Circuit's decision in *United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1 (1st Cir. 2015). In *Gadbois*, the relator filed a lawsuit that was barred by § 3730(b)(5) because it was based on facts materially indistinguishable from those in a pending lawsuit in Wisconsin. *Id.* at 3. While the case was on appeal from the district court's dismissal, the pending action in Wisconsin was settled and dismissed. *Id.* at 4. Thus, the relator sought a remand with leave to file a pleading under Rule 15(d), Fed. R. Civ. P., which would supplement the complaint with the additional fact that the Wisconsin action was no longer pending. *Id.* The First Circuit vacated and remanded to allow the relator to move before the district court for leave to file a Rule 15(d) pleading. In so deciding, the First Circuit held that such a supplemental pleading would be sufficient to cure the jurisdictional defect under § 3730(b)(5). In light of *Gadbois*, relator argues that his Amended Complaint, filed in February 2016, cures any jurisdictional defect under § 3730(b)(5) because the Amended Complaint was filed well after the dismissal of *Saunders*.

*Gadbois* cannot control here, however, because its reasoning is in tension with controlling Fourth Circuit authority. Specifically, *Gadbois* reasoned that the "venerable rule" that subject matter jurisdiction is determined based on whether it existed at the time the plaintiff filed the original complaint "is inapposite to the federal question context" unless there is some allegation of "manipulative abuse of the rule." 809 F.3d at 4-5. Yet, the Fourth Circuit has said in no uncertain terms that it "look[s] at the facts as they existed when the claim was brought to determine whether an action is barred by the first-to-file bar." *Carter*, 710 F.3d at 183. In almost the same breath, the Fourth Circuit described the first-to-file bar as "absolute, unambiguous [and] exception-free." *Id.* at 181. To permit a Rule 15 pleading to alter the jurisdictional analysis by shifting focus away from the state of affairs at the time of commencement would, in essence,

create an "exception" to the first-to-file bar, namely that a relator cannot commence a related action *unless* the already pending action ceases to be pending and the second relator submits a pleading pointing this out. Thus, the First Circuit's evasion of the time-of-filing rule is unavailable here in light of controlling Fourth Circuit authority. As a result, the facts as they existed when relator commenced this action must control the analysis in this case.[17]

Even assuming, *arguendo*, that the foregoing analysis is incorrect, *Gadbois* is, in any event, unpersuasive as it relies on distinguishable cases while failing to adhere to the plain text of § 3730(b)(5),[18] which only a few months prior the Supreme Court had instructed must be given its "ordinary meaning" regardless of "practical problems." *Kellogg*, 135 S. Ct. at 1979-80. In *Mathews v. Diaz*, 426 U.S. 67, 75 (1976), and *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 347 (4th Cir. 2014), cases on which *Gadbois* relies, the Supreme Court and the Fourth Circuit, respectively, held that a failure to exhaust administrative remedies until after the initiation of the lawsuit could be cured by a supplemental pleading. Yet, simply because

---

[17] Moreover, several courts have concluded that regardless of the traditional time-of-filing rule, the plain language of § 3730(b)(5) requires of its own force that the analysis focus only on the events at the time of the initiation of the lawsuit. *See, e.g., United States ex rel. Carter v. Halliburton Co.*, --- F. Supp. 3d ---, 2016 WL 634656, at *2 (E.D. Va. Feb. 17, 2016) (so holding and collecting cases); *United States ex rel. Shea v. Verizon Commc'ns, Inc.*, --- F. Supp. 3d ---, 2015 WL 7769624, at *10 (D.D.C. Oct. 6, 2015) ("[T]he language of § 3730(b)(5)...requires the Court to look to the moment when Plaintiff filed his initial Complaint."); *United States ex rel. Branch Consultants, LLC v. Allstate Ins. Co.*, 782 F. Supp. 2d 248, 259 (E.D. La. 2011) ("The use of the term 'action' in [§ 3730(b)(5)] indicates that the Court should look to the jurisdictional facts that existed at the time the action was filed, as opposed to the facts that existed when the relator later filed an amended complaint.").

[18] *Cf. Carter*, --- F. Supp. 3d ---, 2016 WL 634656, at *2 (E.D. Va. Feb. 17, 2016) (criticizing *Gadbois* for "noting...but not addressing" the textual argument against the conclusion reached and thereby failing to "give sufficient weight to the plain language of 31 U.S.C. § 3730(b)(5), which the Fourth Circuit has emphasized").

19

administrative exhaustion is a threshold jurisdictional requirement that can be cured via Rule 15 does not mean that the same is true of other threshold jurisdictional requirements.

Importantly, administrative exhaustion requirements serve a specific purpose: by channeling claims through an administrative process in the first instance, interested parties obtain notice of the claims and have the potential to resolve disputes more quickly and inexpensively than may typically be accomplished through litigation. *See, e.g., Syndor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012) (discussing the role of administrative exhaustion in the employment discrimination context). In sharp contrast, § 3730(b)(5) serves an entirely different purpose, namely "to *prevent* parasitic lawsuits based on previously disclosed fraud." *Carter*, 710 F.3d at 181 (emphasis added). Simply put, § 3730(b)(5) manifests a congressional intent that whoever loses "the race to the courthouse" should be shut out. *Id.* Not so with administrative exhaustion, the fundamental goal of which is to process every plaintiff's claims as efficiently as possible by requiring less expensive and less burdensome administrative review in the first instance. In other words, administrative exhaustion requirements regulate *when* a plaintiff can bring a lawsuit as part of a scheme to give efficient relief to *every* plaintiff, whereas § 3730(b)(5) regulates *whether* a relator can bring a lawsuit as part of a scheme to reward *only* the fastest and most vigilant whistleblowers. Given these fundamentally different purposes,[19] reliance on cases such as *Mathews* and *Feldman* is unpersuasive in this context. In short, allowing a Rule 15 supplemental pleading to cure to a jurisdictional defect such as failure to exhaust administrative remedies advances the central goal of the exhaustion doctrine, which is to provide plaintiffs with

---

[19] It is worth noting that the purpose of the first-to-file bar is properly considered in determining its application. Indeed, the Fourth Circuit recently applied the FCA's public-disclosure bar in light of that provision's "purpose," which, as with the first-to-file bar, is "preventing…'parasitic' claims." *United States ex rel. Beauchamp v. Academi Training Center, LLC*, --- F.3d ---, 2016 WL 758001, at *7 (4th Cir. Feb. 25, 2016).

efficient resolutions of their claims. But with regard to § 3730(b)(5), the purpose of which is to "prevent" the filing of certain lawsuits, the congressional goal underlying the provision is best effectuated by strict adherence to the plain language. *See Carter*, 710 F.3d at 181.

Finally, relator argues as a matter of policy that treating the Amended Complaint as a supplemental pleading that overcomes the jurisdictional bar will promote efficiency. As the Supreme Court held in *Kellogg*, 135 S. Ct. at 1979, because a case ceases to be "pending" once decided or dismissed, a dismissal under the first-to-file bar must be without prejudice to refiling once the earlier action is no longer pending. Thus, the practical effect of dismissing Count II is simply that relator must re-file his lawsuit as a new action. Indeed, *Gadbois* described dismissal in an analogous situation as "a pointless formality" that "would needlessly expose the relator to the vagaries of filing a new action." 809 F.3d at 6. In *Kellogg*, however, the Supreme Court conceded that although there was "merit" to the argument that strict adherence to the plain language of § 3730(b)(5) "would produce practical problems," such concerns could not alter the statutory analysis. 135 S. Ct. at 1797. The same is true here. No doubt it would be more efficient to allow a jurisdictionally barred action to be saved by supplementation or amendment once the bar is removed, but to do so would be to ignore the language Congress enacted and the purpose Congress sought to achieve.

Thus, Count II must be dismissed without prejudice under § 3730(b)(5). Because an amendment cannot cure the jurisdictional fact that this action commenced during the pendency of a factually related case, leave to amend must be denied as futile. Nevertheless, Count II may be refiled as a new action, consistent with *Kellogg*.

## B.

Although the conclusion that the first-to-file bar precludes the assertion of Count II in this action is sufficient to resolve the instant motion, it is worth considering Unisys's *res judicata* argument, but only in the alternative.[20] Under the doctrine of *res judicata*, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). Unisys argues that the Settlement Agreement from *Saunders* and the subsequent dismissal with prejudice trigger *res judicata* as to the claim in Count II. In this respect, it is clear that *Saunders* resulted in a final judgment on the merits. *See Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001) (dismissal with prejudice is an adjudication on the merits). Less evident, but equally true, *Saunders* was an action between the same parties, as the United States is the true party in interest in an FCA action. *See United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 912 (4th Cir. 2013). The fact that a new relator brings a new lawsuit is of no moment because "the FCA 'effect[s] a partial assignment of the Government's damages claim.'" *Id.* (quoting *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000)). Thus, if the federal government has no damages claim by operation of a release, it follows that a new relator has no interest because there is nothing to assign.[21]

---

[20] If the § 3730(b)(5) analysis is correct and subject matter jurisdiction over Count II is lacking, the *res judicata* analysis is mere *dicta*. But if the § 3730(b)(5) analysis is flawed, then the *res judicata* analysis reflects an alternative basis for disposing of Unisys's motion to dismiss.

[21] Indeed, relator concedes that he "is in privity with the government" and therefore cannot recover if *res judicata* bars any claims asserted here but covered under the *Saunders* Settlement Agreement. *See* P. Opp. (Doc. 35) at 13.

In light of the foregoing, the only disputed issue with respect to *res judicata* is whether the claim in Count II shares an identity with the cause of action resolved by stipulated dismissal in *Saunders*. In the Fourth Circuit, "the traditional *res judicata* inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement." *Id.* at 913. Specifically, "given the contractual nature of...settlement agreements, the preclusive effect of a judgment based on such an agreement can be no greater than the preclusive effect of the agreement itself." *Id.* Thus, a judgment that rests on an agreement should be given effect according to the intention of the parties as understood under ordinary principles of contract law. *See id.* In Unisys's view, the *Saunders* Settlement Agreement covers all of the conduct alleged in the *Saunders* SAC, which Unisys further argues shares a nucleus of operative facts with the instant action such that *res judicata* applies to the whole of Count II. Relator, in turn, argues that the *Saunders* Settlement Agreement covers only the fraudulent billing schemes committed under CLINs 1 and 2.

Under the terms of the *Saunders* Settlement Agreement, the United States released Unisys from FCA liability only for "Covered Conduct." The Settlement Agreement defines "Covered Conduct" as "[t]he conduct alleged in the Second Amended Complaint and summarized" as "regarding Contract Line Item Numbers (CLINs) 0001 and 0002 of Task Order ("TO") 122." *See* Settlement Agreement, ¶ R-4. As such, relator argues that by focusing on the allegedly fraudulent scheme under CLINs 1 and 2, the *Saunders* Settlement Agreement manifests the parties' intent to cover only the conduct related to those CLINs. This argument, however, does not account for the nature of FCA liability. As the Fourth Circuit has explained, the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Harrison v. Westinghouse Savannah River Co.*, 176

F.3d 776, 785 (4th Cir. 1999) (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)).[22] In this respect, even though the Settlement Agreement releases Unisys from liability only for CLINs 1 and 2, the Settlement Agreement must be understood as releasing Unisys from liability for the *claims* (*i.e.*, fraudulent invoices) it submitted, not simply from liability for the fraudulent scheme.[23] Thus, if these same claims for payment were also false because they misrepresented time worked under CLIN 4, then any CLIN 4 fraud does not survive the settlement agreement; the United States released Unisys from FCA liability for the whole of the claim submitted.[24] And in fact, the Amended Complaint acknowledges that Unisys submitted consolidated invoices when billing under TO 122, such that all CLINs were represented in a single claim for payment each month. *See* Am. Comp. ¶¶ 24, 44. Thus, any claim for payment that contained false statements as to both CLIN 4 and either or both CLIN 1 or CLIN 2 is

----

[22] *See also Nathan*, 707 F.3d at 456 ("[T]he critical question is whether the defendant caused a false claim to be presented to the government, because liability under the [FCA] attached only to a claim actually presented to the government for payment, not to the underlying fraudulent scheme.").

[23] Relator argues that the Settlement Agreement can be read as an agreement by the United States not to pursue an FCA liability on the claims only to the extent the claims are based on the scheme under CLINs 1 and 2. This reading of the Settlement Agreement is unpersuasive. Under the Settlement Agreement, the United States released Unisys from liability for "any civil monetary claim…for the Covered Conduct under the [FCA]." Settlement Agreement, ¶ 3. To give effect to the plain language of the Settlement Agreement and the nature of FCA liability, to surrender a "claim…under the [FCA]" must mean to release the defendant from liability for the entire claim for payment. *See Nathan*, 707 F.3d at 456.

[24] *Cf. United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 910 (4th Cir. 1998) (in *res judicata* analysis under the FCA, "[i]t d[oes] not matter to the settlement and judgment whether [defendant's] invoices were false for two reasons or one reason [because] [t]he material fact was that the invoices were false").

covered and released by the *Saunders* Settlement Agreement and cannot be pursued in this action under the doctrine of *res judicata*.[25]

But this does not end the analysis. As the Settlement Agreement makes clear, the claims for which the United States released Unisys from FCA liability were submitted beginning on March 11, 2008, and ending on October 7, 2010. *See* Settlement Agreement, ¶ R-4. In the Amended Complaint, however, relator alleges that false claims for payment under CLIN 4 were submitted between April 2008 and October 2011. *See* Am. Comp. ¶ 79. Thus, relator alleges that Unisys submitted false claims under CLIN 4 for an entire year beyond the Covered Conduct in the *Saunders* Settlement Agreement. Because these November 2010 through October 2011 false claims do not contain CLIN 1 or 2 fraud, they do not relate to the claims for which Unisys was released from liability, and *res judicata* does not bar suit on these claims.

Perhaps in anticipation of this result, Unisys notes that the Settlement Agreement was not incorporated into the dismissal order and is therefore not part of the judgment. As such, Unisys argues that traditional *res judicata* principles apply, and *all* claims related the overall fraudulent scheme should be barred. This argument fails. Importantly, the stipulation of dismissal in *Saunders* was under Rule 41(a)(1)(A)(ii), Fed. R. Civ. P., which by its plain language and by the great weight of judicial authority operates automatically and without the approval of the court. *See Malibu Media, LLC v. Baiazid*, --- F. Supp. 3d ---, 2015 WL 6759448, at *3 n.1 (E.D. Va. Nov. 5, 2015) (so holding and collecting authority from ten circuit courts of appeals). In contrast, voluntary dismissals under Rule 41(a)(2), Fed. R. Civ. P., require a court order and limit dismissal to the "terms that the court considers proper." Were the *Saunders* stipulation of

---

[25] Neither reached nor decided here is relator's argument that the allegedly fraudulent supporting documentation attached to the claims for payment remains a valid basis for FCA liability apart from liability for the claims themselves.

dismissal under Rule 41(a)(2), Unisys's argument might have merit; if the order of dismissal imposed no conditions, then one could argue that the issuing judge saw no conditions as proper. But with respect to the dismissal of *Saunders*, the record reflects (i) that the parties consented to detailed settlement agreement and (ii) that the parties thereafter consented to dismissal, which they brought about by their execution of the stipulation. Because the Settlement Agreement and the dismissal were both effectuated solely by the parties' mutual agreement, the logic of applying contract law principles applies with its greatest possible force on these facts. And, importantly, Fourth Circuit precedent appears to reject the rigidly formalistic requirement that a settlement agreement must be incorporated into the dismissal order in order to control the *res judicata* effect of the dismissal. *See May*, 737 F.3d at 913 (a judgment need only be "based on" a settlement agreement) (citing, *inter alia*, 18A Wright & Miller, Federal Practice & Procedure § 4427 (a judgment need only "rest on" a stipulation)).

Accordingly, in the event the analysis under § 3730(b)(5) is incorrect and subject matter jurisdiction exists, then *res judicata* would operate, but only to bar suit on those claims for payment that contained false statements as to both (i) CLIN 4 and (ii) either or both of CLIN 1 or CLIN 2. Thus, even if subject matter jurisdiction existed as to Count II, it would be appropriate to dismiss Count II with prejudice to the extent that it alleges liability for invoices submitted between March 11, 2008, and October 7, 2010.

## IV.

For the foregoing reasons, Unisys's motion to dismiss must be granted. Count I must be dismissed with prejudice for failure to state a claim for worthless services, with leave to amend denied on the ground of futility because relator's proffered facts would not rescue the claim. Count II must be dismissed without prejudice to relator's re-filing the claim as a new FCA

26

action. The *res judicata* analysis does not warrant dismissing portions of Count II with prejudice because the *res judicata* analysis applies if and only if the subject matter jurisdiction conclusion is incorrect.

An appropriate Order will issue.

Alexandria, Virginia
April 5, 2016

T. S. Ellis, III
United States District Judge